SALLY SANFORD *vs.* ARTHUR H. VINAL, JR., trustee, & others.[1]

No. 88-P-986.

Plymouth. December 15, 1988. - April 13, 1990.

Present: WARNER, C.J., ARMSTRONG, & KASS, JJ.

*Cemetery. Real Property*, Cemetery lot. *Practice, Civil*, Standing. *Jurisdiction*, Cemetery.

Discussion of the origin and extent of the equitable rights in a family burial plot exercisable by a descendant of one whose remains are interred therein, including the right to protect ancestors' graves from desecration. [483-486]

Where an ancient burial ground had been so long neglected that it was not recognizable as a cemetery, and professional researchers had not succeeded in locating gravesites, a descendant of one whose remains were believed to be interred therein had no standing, in her own right, to require that the owners of the land abstain from using it for other purposes. [486-488]

Where an ancient burial ground had been so long neglected that it was not recognizable as a cemetery, any equitable rights of a descendant of one whose remains were believed to be interred therein to protect the integrity of the site became merged with the statutory rights of the public generally to insist that due respect be paid to the sanctity of burial grounds and human remains if encountered inadvertently in the course of land development. [488]

CIVIL ACTION commenced in the Superior Court Department on May 16, 1988.

The case was heard by *James P. Lynch, Jr.*, J., on a motion for summary judgment.

*Charles K. Mone* for the plaintiff.

*Peter L. Puciloski* for Arthur H. Vinal, Jr., trustee.

*Robert E. Galvin*, Town Counsel, for the Planning Board of Norwell & another, was present but did not argue.

[1]Planning board of Norwell and the building inspector of Norwell.

ARMSTRONG, J. The plaintiff, an eighth-generation descendant of Edward Wanton, who died in 1716, appeals from a judgment dismissing an action brought to protect from development a family burial plot that contains Edward Wanton's grave and other graves of the Wanton family. The burial plot is said to have fronted on the North River in Norwell, probably (but by no means certainly) on a riverfront tract now owned by Blackthorne Realty Trust. Efforts to find its location within the tract have so far met with failure. The trustee, the defendant Vinal, has subdivided the tract of sixteen acres into four lots intended for houses. The plaintiff commenced this action when construction was imminent.[2]

To set the stage for the present dispute, we sketch briefly some of the background relating to Edward Wanton and the burial ground. Wanton is a figure of historical importance, particularly as a leader of the Quaker community in colonial America. Said to have been one of the sheriff's deputies in 1660 at the hanging of the Quaker, Mary Dyer, in Boston and to have been so moved by her words on the gallows as to be won over to Quakerism soon thereafter,[3] Wanton settled on an eighty-acre tract of land in Norwell (then a part of the town of Scituate known as South Scituate) that had been granted by the Colony Court of Plymouth Colony to William Parker in 1636 and then conveyed by Parker to Wanton in 1661. There Wanton established a successful shipbuilding yard on the North River — one of several that flourished in the Scituate-Pembroke area in the late 1600's and early 1700's before they were displaced by yards on large rivers capable of building the clippers and other large ships. In 1705 Edward Wanton conveyed the greater part of his land to his son Michael, who, by a deed dated February 3, 1707 or 1708,[4]

---

[2] The plaintiff obtained a temporary restraining order on May 16, 1988, the day the action was filed, but preliminary injunctive relief was denied after hearing on May 26, 1988.

[3] "A Record of ye Deaths of Friends & Thear Children," page 25, from Records of the Rhode Island Monthly Meeting, Society of Friends, Book # 822, Newport [R.I.] Historical Society.

[4] The original deed reads "ye third of February Anno Domine one thousand seven hundred & seven or eight, 1707,8."

conveyed back to his father and John Rogers of Marshfield, also a Quaker, "a Certain Piece or Parcel of Land Containing a Quarter of an acre . . . for a Burying Place for them ye said Wanton & Rogers their Heirs & Assigns Familyes & Posterityes for Ever to Bury their Dead in from time to time forever, & for no other use whatsoever, being that parcel of Land lying toward ye North East from my Dwelling House which hath been and still is Used and Fenced in for a Burying Place & to continue in the same Breadth as it is now fenced toward ye North East till it make up the Quantity of a Quarter of an acre with a foot way or Privilege to pass on foot from ye said House to the Burying Place aforesaid & back again as there shall be occasion. . . ."

The only other mention of the burial ground in deeds[5] was in 1745, when Wanton heirs, by then of Newport, Rhode Island (where Quakers were better tolerated than in Massachusetts),[6] conveyed to John Studson of Scituate a seventy-nine acre parcel of land on the North River, apparently the entire Wanton holding, excepting a half acre reserved for a public landing, "and Excepting also out of the aforesaid Seventy nine acres of land The Burying Place Containing one quarter of an acre to be and Remain a Burying place forever for all Persons Whomsoever With free Egress and Regress for all persons to and from Said Burying Ground."

Contemporary records (see note 3, *supra*) indicate that Edward Wanton passed away in 1716 shortly after returning from a Friends quarterly meeting in Newport and that he was buried in the family ground. Records indicate that other Wantons and Rogerses were also buried there, and histories of Scituate in the 1800's mention the existence of the Old Quaker Burying Ground. Several, however, indicate that the burying ground had been damaged by vandals and that few if any stones, mostly broken, remained. By the 1900's much

[5]One Thomas Rogers in 1745 left in his will funds "to fence in the Burying Place that lyes in Scituate Near ye Dwelling house that was Michael Wanton's deceased. . . ."

[6]Four Wantons served as Governors of Rhode Island during the period 1732 to 1775.

of the land was difficult to penetrate, covered in parts with dense briars or other growth. In the 1930's a Dr. M.H. Bailey removed from the area a well preserved slate headstone with this inscription: "Mary Webb ye wife of Edward Webb of Boston died ye 23d 8 mo 1708." Another historical record lists Mary Webb as one of the community of Friends, but, unfortunately, no record was preserved of the place from which the Webb stone was removed.[7] There is indication in the record that some of the earlier grave shafts may not have been marked by stones — Quakers of that era often preferring, as a persecuted sect, not to advertise their gravesites for fear of desecration.

The upshot of all this is that the location of the burial ground has, in effect, been lost. It has proven impossible — at least so far — to connect up modern land boundaries with those of the original Wanton tract.[8] The cemetery is known to have been a few rods northeast of the Wanton home, but the location of the home itself is in question. Some older residents familiar with the area could recall seeing no headstones during their lives; others indicated that they had seen one or more headstones in time past but disagreed as to their locations.[9] One John P. Richardson of Hingham, a historian and archaeologist with experience in site investigation, was retained by the trust in 1986 — as a preliminary to the contemplated subdivision — to locate the Old Quaker Burial Ground. His researches led to the discovery of headstone fragments on a rise overlooking the North River which is referred to in the exhibits as "Plot C." Further research led to

[7] It was said to have been found leaning against a tree, so it may have been removed from its original location at an earlier time.

[8] This became apparent when one Emma J. Bailey sought registration of two riverfront parcels in the late 1930's. The title examiner's report traced titles back to the late 1800's and registered his frustration at not being able to locate Merrill's Meadow and Delano's Meadow, both of which were for years excepted from relevant deeds. A University of Massachusetts Archaeological Services Study (discussed later in the text of this opinion) speculated that those meadows might contain the burying ground.

[9] The locations suggested by these residents are the areas marked on the exhibits as "Plot A" (Bennett), "Plot B" (Bailey), and "Plot C" (Henderson).

the discovery of two headstone foundations in the same area, and, as the site corresponded with descriptions in Scituate histories written in the late 1800's and with the recollections of one of the older residents (see note 9, *supra*), Richardson was satisfied that the burying ground had been located.

Relying on the Richardson study to locate the ancient burial ground (disturbance of which would create problems in light of various statutory provisions mentioned at the end of this opinion), Vinal as trustee of Blackthorne filed on November 2, 1986, an application with the planning board of Norwell to subdivide the sixteen-acre parcel into four house lots. On February 23, 1987, the board approved the preliminary plan with conditions that required identification of the Wanton homestead site and more definite identification of the burial ground.[10]

The definitive plan was submitted for approval that spring. This was approved on June 29, 1987, subject to five conditions, three of which[11] required Vinal at his own expense to commission a professional archaeological study to locate the burial ground and mark its boundaries. The work was to be done in the area designated by the board, and construction was not to commence until the work had been done to the

---

[10]Condition 4 read: "Location of the burial site needs to be worked out in concert with the Norwell Historical Commission in a unified effort, using non-destructive methods under the Massachusetts Historical Commission's guidelines."

[11]The relevant conditions read:

"3. No construction will commence until the burial ground has been located, marked in the field, and shown on the Definitive Subdivision Plan, to the satisfaction of the Planning Board.

"4. The Developer will locate the burial ground by performing resistivity testing by a Professional Archaeologist acceptable to the Planning Board. The consultant is to be engaged by the Developer at no cost to the Town of Norwell. The name and qualifications of the Consultant are to be submitted to the Planning Board prior to the beginning of testing.

"5. The area of testing is to be as identified by the Planning Board and described as in the general area of the previously located and identified stones approximately 100 feet from the natural bank of the Salt Marsh and generally on the Westerly boundary of Lot 4, as shown on the plan."

board's satisfaction. With the approval of the plaintiff and other Wanton descendants, Vinal engaged the University of Massachusetts Archaeological Services to do the work, and the board designated plot C as the area of testing. Disappointingly, their research failed to confirm that plot C was the area of the burial ground. Soil resistivity testing, possibly hampered because the work was done in November and December, when the ground was wet, proved inconclusive; excavations revealed no grave shafts, even under the gravestone bases that had been located by Richardson; and extensive efforts to pinpoint the burial ground through historic records and local histories failed to support more than a general conclusion that it lay somewhere in the vicinity and not necessarily on the Vinal land.[12] The study suggested further excavations and additional soil resistivity testing at a drier time of year. The University of Massachusetts Archaeological Services did not do soil testing and excavations in the areas other than plot C (i.e., plots A and B, see note 9, *supra*), which older residents claimed to have contained gravestones at an earlier time; Vinal felt this was unnecessary as no construction was planned for those areas.

On April 25, 1988, the planning board ruled that the conditions had been complied with to its satisfaction. It voted to endorse the plan with four conditions,[13] one of which required that construction stop immediately if human remains

---

[12]In general, the study accepted as true that the sixteen-acre subdivision was located within the original eighty-acre Wanton tract. It concluded that plot C was probably (but not certainly) not the site of the burial ground, and it reflected a substantial possibility that the burial ground was located altogether off the Vinal subdivision.

[13]The four conditions were:

"1. Prior to the release of Lot 4, the Planning Board shall review the Board of Health septic system plan with the intent of locating the house as far away from 'Plot C' as possible.

"2. With the submission of the Report prepared by University of Massachusetts, 'Historic Background Research and Geophysical Survey of a Potential Quaker Burial Ground in Norwell, Massachusetts', the Planning Board releases the conditions set forth as #4 and #5 of the Certificate of Vote.

"3. Regarding Condition #3, in the opinion of the Planning Board, the applicant has attempted to locate the gravesite to the best of his ability.

should be encountered. In May, with construction about to begin, the plaintiff filed the complaint in this action.

The complaint had three counts. The first and second were directed at the planning board[14] and the building inspector, respectively, for their roles in the allegedly unlawful approval and endorsement of the subdivision plan and the anticipated issues of building permits. The illegality lay (so the complaint alleged) in a violation of G. L. c. 114, § 17, which prohibits municipalities from alienating or appropriating to any other use than that of a burial ground any tract of land that has been used for more than one hundred years as a burial place. The third count was directed against Vinal and the Blackthorne Realty Trust, seeking injunctive relief to block commencement of any construction work.

The judge in a thoughtful and comprehensive memorandum allowed summary judgment for the defendants on the ground that the plaintiff lacked standing to maintain the action. As applied to the municipal defendants, the judge ruled that the plaintiff was not a "person aggrieved" within the meaning of G. L. c. 41, § 81BB, not having a legal interest in the subdivision property or property in the vicinity of the subdivision. See *Carey v. Planning Bd. of Revere*, 335 Mass. 740, 743-744 (1957); *Nantucket Land Council, Inc. v. Planning Bd. of Nantucket*, 5 Mass. App. Ct. 206, 209 n.5 (1977). The judge conceded that the regulations promulgated by the planning board required developers to preserve "area[s] of unusual historic value including buildings and the grounds around them"; but the nature of the interest claimed by the plaintiff in the burying ground does not, the judge ruled, make her "one whose legal rights have been infringed." *Circle Lounge & Grille, Inc. v. Board of Appeal of*

___

"4. If any remains of bodies are located, work must stop immediately and the Planning Board be so informed immediately."

[14]The judge interpreted count I as an appeal under G. L. c. 41, § 81BB, which provides that the endorsement should be withheld for twenty days after the clerk is notified of the decision of the planning board. Within that time the plaintiff had entered this action, but apparently the clerk was not notified of its entry (as required by § 81BB). See *Nantucket Land Council, Inc. v. Planning Bd. of Nantucket*, 5 Mass. App. Ct. 206, 208-211 (1977).

*Boston,* 324 Mass. 427, 430 (1949). "Here," the judge wrote, "Sanford's claims to equitable rights arising under a trust theory do not rise to a legal right, e.g., to title to the land" (citing *Trefry* v. *Younger,* 226 Mass. 5, 9 [1917]). Under count 3, the judge ruled that any legal claim by Edward Wanton's heirs of title to or easements in the burial ground, under the 1707 or 1708 deed, was cut off by the 1941 Land Court decree, whereby the riverfront part of the Blackthorne tract was registered and confirmed in Emma J. Bailey. (See note 8, *supra.*) Finally, recognizing that Sanford's claim of rights under a trust theory might still be within the jurisdiction of the Superior Court (under G. L. c. 185, § 1[k], concurrent with the Land Court), the judge ruled that the claim of equitable rights would pertain only to Wanton's heirs at law (citing here *Messina* v. *LaRosa,* 337 Mass. 438, 442 [1958]; *Jacobus* v. *Congregation of the Children of Israel,* 107 Ga. 518, 522 [1899]; *Sabin* v. *Harkness,* 4 N.H. 415, 417 [1828]; *Heiligman* v. *Chambers,* 338 P.2d 144, 148 [Okla. 1959]). Sanford made no showing that she was the heir, or one of the heirs, of Edward Wanton.[15]

It is the last point that Sanford most strenuously contests. Descendants generally, she argues, should have standing in a court of equity to protect the graves of their ancestors from desecration. She relies, particularly, on a much-followed[16] Tennessee case, cited by the judge, *Hines* v. *State,* 126 Tenn.

---

[15]After the judge had allowed the motion for summary judgment, Sanford filed a motion to add her mother as a party plaintiff. The motion was denied without explanation, but one plausible reason is that Sanford made no showing that her mother was an heir of Wanton. In her brief, Sanford indicates that her mother would be an heir if the judge "interpreted the term 'heir-at-law' to encompass persons who would inherit if Edward Wanton died today without a will." It is conceded that, if the term "heirs" is taken to mean those persons who inherit the property of an intestate at the time of his death, see 2 Newhall, Settlement of Estates § 219 (1958); *Mitchell* v. *Thorne,* 134 N.Y. 536, 540 (1892), no heirs of Edward Wanton would be alive today.

[16]See, e.g., *Mingledorff* v. *Crum,* 388 So. 2d 632, 635-636 (Fla. Dist. Ct. App. 1980); *Haslerig* v. *Watson,* 205 Ga. 668, 682-684 (1949); *Rhodes* v. *Nicklas,* 624 S.W.2d 504, 507-508 (Mo. Ct. App. 1981); *Heiligman* v. *Chambers,* 338 P.2d 144, 147-148 (Okla. 1959); *White* v. *Williams,* 57 S.W.2d 385, 386 (Tex. Civ. App. 1933).

1 (1911), which, like the present case, involved a family burial plot on a farm which had passed from family ownership to strangers. The legal relationship thereafter of the family to the burial ground was described (at 4-5) in these terms:

> "When land has been definitely appropriated to burial purposes, it cannot be conveyed or devised as other property, so as to interfere with the use and purposes to which it has been devoted. When once dedicated to burial purposes, and interments have there been made, the then owner holds the title to some extent in trust for the benefit of those entitled to burial in it, and the heir at law, devisee, or vendee takes the property subject to this trust. The right of burial extends to all the descendants of the owner who devoted the property to burial purposes, and they may exercise it when the necessity arises.
>
> "They also have the right to visit the cemetery for the purpose of repairing, beautifying, and protecting the graves and grounds around the same, and for these purposes they have the right of ingress and egress from the public road nearest the cemetery, to be exercised at seasonable times and in a reasonable manner."

Early Massachusetts cases, if read superficially, seem to restrict standing in grave-desecration cases to those who hold legal title to the burial ground. See, e.g., *Meagher* v. *Driscoll*, 99 Mass. 281, 284 (1868)("though the heir has a property in the monuments and escutcheons of his ancestors, yet he has none in their bodies or ashes; nor can he bring any civil action against such as indecently at least, if not impiously, violate and disturb their remains when dead and buried"); *Feeley* v. *Andrews*, 191 Mass. 313, 317 (1906)("when the plaintiffs' father committed the bodies of his child and his wife to the earth, they became part of the land of another, and the only person who could maintain an action for interfering with those bodies is the owner of the land of which those bodies became a part"). But these cases must be understood in the context of the strict division then obtaining

between courts of law and courts of equity: they were legal actions for damages, sounding in the form of action called trespass quare clausum fregit, which could be maintained only by a person who was in lawful possession of the land. *Barnstable* v. *Thacher*, 3 Met. 239, 242 (1841); *Meagher* v. *Driscoll*, 99 Mass. at 284. In the ordinary case of lots in public cemeteries, the "certificate or deed . . . conveys the privilege to make interments in the lots; it is not a grant of any interest in the soil, but is in the nature of an easement or irrevocable license so long as the place continues as a burial ground." *Trefry* v. *Younger*, 226 Mass. at 9. See also *Lakin* v. *Ames*, 10 Cush. 198, 220-221 (1852). Here, as a result of the deed of 1707 or 1708, Edward Wanton and Joseph Rogers held title to the burial ground in fee, and, absent contrary provisions in wills, the title would have descended to their heirs. See G. L. c. 114, § 31. We know the burial ground was excepted from the 1745 conveyance by which title to the farm passed from the Wanton family. Thereafter the record is silent, but we know that the certificate of title confirmed in Emma J. Bailey in 1941 extinguished any possessory rights that may have remained in the Wanton heirs down to that date. It is thus true that, under the *Meagher* v. *Driscoll* line of cases, the Wanton descendants, indeed even the Wanton heirs, would now lack standing to maintain an action at law for damages for the desecration of their ancestors' graves.

There is no necessary inconsistency between this line of cases and the *Hines* case, on which the plaintiff relies and which recognized equitable rights in descendants of ingress to and egress from the family burial plots to preserve and beautify, to meditate and to bury. Thus, it was said in *Mc-Andrew* v. *Quirk*, 329 Mass. 423 (1952), that, although "[t]he purchaser of a cemetery lot ordinarily does not obtain a fee in the lot but acquires only a right to burial or an easement to use the lot for burial of the dead so long as the place continues to be used as a cemetery," *id.* at 425, nevertheless such a lot "is a family burial lot. It is that fact alone which gives a peculiar limitation to its tenure. The heir takes it subject to all the conditions for which the ancestor held it. A

sort of trust attaches to the land for the benefit of the family." *Id.* at 426, quoting from *Waldron, petitioner*, 26 R.I. 84, 86 (1904). In *Messina* v. *LaRosa*, 337 Mass. 438 (1958), the court recognized standing in the plaintiff to protect the integrity of her deceased sister's gravestone and to prevent the burial of strangers in her grave lot by the person who had succeeded to legal ownership. "This is not an application of any rule of property law," the court said, "but is a recognition of principles of ethics, propriety, and common decency which equity is peculiarly qualified to enforce." *Id.* at 442. See also *Antoniewicz* v. *Del Prete*, 340 Mass. 742, 743 (1960), recognizing the right of the family to obtain equitable remedies against encroachment on the family burial plot.

There is no need in this case to consider in further detail the rights of descendants in a family burial plot. Even under the *Hines* line of cases, on which the plaintiff relies, the rights of descendants only continue "so long as the lot is kept inclosed, or, if uninclosed, so long as the monuments and gravestones marking the graves are to be found there, or other attention is given to the graves, so as to show and perpetuate the sacred object and purpose to which the land has been devoted." *Hines* v. *State*, 126 Tenn. at 6. To the same effect, see *Mayes* v. *Simons*, 189 Ga. 845, 848-849 (1940)("if interments have not been made for a long time, and can not be made therein, and in addition the public, and those interested in its use, have failed to keep and preserve it as a resting place for the dead, and have permitted it to be thrown out to the commons, the graves to be worn away, gravestones and monuments to be destroyed, so that the graves have lost their identity, or if it has been so treated or neglected by the public as entirely to lose its identity as a graveyard, and is no longer known, recognized, and respected by the public as such, then it has been abandoned"); *Smith* v. *Ladage*, 397 Ill. 336, 346 (1947)("As long as the cemetery is kept and preserved as a resting place for the dead, with anything to indicate the existence of graves, or as long as it is known and recognized by the public as a graveyard, it is not abandoned"); *Brunton* v. *Roberts*, 265 Ky. 569, 571-572

(1936)(rights of descendants continue "as long as the graves
are marked and distinguishable and the cemetery continues
to be used"); *Touro Synagogue* v. *Goodwill Indus. of New
Orleans Area, Inc.*, 233 La. 26, 38 (1957)("The cemetery
. . . has clearly been abandoned. This burial ground has re-
ceived no interment since 1872 and in its condition of disinte-
gration is presently unfit for this purpose. . . . [T]he public
and the survivors or others interested in its use as a cemetery
have failed to keep and preserve it as a resting place for the
dead. The premises have been permitted to fall into disorder,
the walls to crumble, and the gravestones and monuments to
be destroyed so that graves have lost their identity. . ."); 
*Damon* v. *State*, 52 S.W.2d 368, 370 (Tex. Commn. App.
1932)(abandonment shown by evidence "that, if any bodies
were ever buried on this land, their graves have been obliter-
ated by the lapse of time, and abandoned by the living, and
that such graves cannot now even be located or identified"). 
See also *Mingledorff* v. *Crum*, 388 So. 2d 632, 636 (Fla.
Dist. Ct. App. 1980); *Hill Sand & Gravel Co.* v. *Pallottine
Fathers House of Studies, Inc.*, 220 Md. 526, 530-531
(1959); *Campbell* v. *Kansas City*, 102 Mo. 326, 348-356
(1890); *Heiligman* v. *Chambers*, 338 P.2d 144, 148 (Okla.
1959).

The present case is in principle within those authorities.
The Wanton burying ground, doubtless in the 1700's an ac-
tive cemetery, apparently fell into disuse when the Quaker
community gradually shifted south to the more congenial set-
tlements of Rhode Island. Stones remained, according to
some older residents, into this century, but all that now re-
mains is fragments. Researchers have not succeeded in locat-
ing gravesites. All that can be said with certainty is that
somewhere in the earth in the vicinity of the Blackthorne
tract is concealed a cluster of ancient graves.

The mere passage of time does not extinguish the rights of
descendants in a family burial ground; but where the family
has ceased to visit the cemetery and where they have so long
neglected to care for it that the ground is no longer recogniz-
able as a cemetery, the family burial ground has been aban-

doned, and with it the private standing of the descendants to require that those who own the land abstain from using the land for other purposes. See *Touro Synogogue* v. *Goodwill Industries of New Orleans Area, Inc.*, 233 La. at 39;[17] *VanBuskirk* v. *Standard Oil Co.*, 100 N.J.Eq. 301, 307 (1926).[18] The rights of the descendants, in this situation, become merged with the right of the public generally to insist that due respect be paid to the sanctity of human remains and human burial grounds if they should be uncovered inadvertently: a concern that finds expression in such statutes as G. L. c. 9, § 27C, as amended by St. 1983, c. 659, § 4; G. L. c. 114, § 17; and G. L. c. 38, § 6B, as amended by St. 1984, c. 189, § 46.[19] Those statutes, of course, as well as the express condition imposed by the planning board, will require the Blackthorne developers to cease all work immediately if they should happen upon human remains, so as to enable public authorities to assess the situation in light of the new information.

Although for somewhat different reasons from those relied on by the motion judge, the judgment dismissing the complaint for want of standing was correct.

*Judgment affirmed.*

---

[17]"[T]he survivors or relatives of those interred in the burial ground have abandoned it and permitted it to disintegrate and become unfit for burials. . . . Under these facts the survivors or relatives . . . have no right to invoke against Touro the provisions found in the charter of its predecessor. . . ."

[18]"Some of the complainants had not visited the place for over thirty years. None of them had made any effort to care for it. The grandchildren who are complainants took no interest in the matter. They all waited before seeking any relief until the burial plot bore no resemblance to a cemetery. . . . Equity discourages attempts to enforce claims where parties have for many years slept on their alleged rights."

[19]It is not necessary, for purposes of this decision, to consider the application of G. L. c. 272, §§ 71-74 and 76, to burial grounds that are not recognizable as such but which are encountered inadvertently in the course of other work. See generally Rounds, Protections Afforded to Massachusetts' Ancient Burial Grounds, 73 Mass. L. Rev. 176 (1988), arguing for a more systematic statutory and regulatory scheme to protect ancient burial grounds threatened by land development.