NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13326


CHURCH OF THE HOLY SPIRIT OF WAYLAND & others[1]  vs.  MARILYN J.
HEINRICH & others[2] (and a companion case[3]).



Middlesex.     December 5, 2022. - March 14, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Church.  Cemetery.  Contract, Church, Construction of contract.
     Common Law.



     Civil action commenced in the Middlesex Division of the
Probate and Family Court Department on August 29, 2017.

     The case was heard by Camille F. Sarrouf, Jr., J., sitting
under statutory authority, on motions for summary judgment.


-----

     [1] The Episcopal Diocese of Massachusetts and Saint
Philopateer Mercurius & Saint Mina Coptic Orthodox Church, Inc.

     [2] John Doe Heinrich No. 1, John Doe Heinrich No. 2, Mary
Wilson, John Doe Wilson, John Doe Hodgins, Christopher Woodcock,
John Doe Woodcock No. 1, John Doe Woodcock No. 2, Carolyn J.
Kiradjieff, John Doe Jobes No. 1, John Doe Jobes No. 2, Mary Ann
Montague, John Doe Turner No. 1, John Doe Turner No. 2, Judy
Mosedale, John Doe Mosedale No. 1, John Doe Mosedale No. 2,
Stephanie P. Edwards, John Doe Edwards No. 1, and John Doe
Edwards No. 2.

     [3] Mary J. Wilson & others  vs.  Church of the Holy Spirit of
Wayland & others.

Civil action commenced in the Superior Court Department on June 28, 2019.

A motion to dismiss was heard by Camille F. Sarrouf, Jr., J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.


William F. Gramer (Nicholas K. Holmes also present) for Marilyn J. Heinrich & others.
Jennifer Grace Miller for Church of the Holy Spirit of Wayland & another.
Audrey Y. Botros for Saint Philopateer Mercurius & Saint Mina Coptic Orthodox Church, Inc.


LOWY, J.  This case concerns the scope of rights conveyed by a set of burial certificates, as sold by a church to its parishioners.  After dwindling membership compelled the Church of the Holy Spirit of Wayland (Church of the Holy Spirit, or church) to close and sell its property, do the certificates permit the church to disinter and relocate the cremated remains buried on that property despite the objections of the decedents' families?

Although we acknowledge the sensitive -- even sacred -- nature of the subject matter of this dispute, we conclude that the burial certificates' unambiguous language permits the disinterment and that no common-law right held by the families prevents it.  We therefore affirm.

Background.  The material facts are undisputed.  The Church of the Holy Spirit was established in 1961 as a parish of the

Episcopal Diocese of Massachusetts.  In the late 1960s, the church set aside a portion of its land for use as a "Memorial Garden," also referred to as a "Churchyard."  Parishioners could arrange for cremated remains (cremains) to be interred in the Churchyard by purchasing a certificate from the church.  Between 1969 and 2008, a number of such certificates were sold.  The one-page certificates each granted the purchaser a right to one or more interments that were "subject to the regulations of the Churchyard now or hereafter in force."

The referenced regulations were wide ranging.  They covered, among other things, the Churchyard's operations and layout, groundskeeping restrictions, permitted styles of memorial plaques, and procedures for interment.  The regulations also contemplated disinterment of cremains, specifying that disinterment was forbidden "without the consent of [the Church of the Holy Spirit]."  And, consistent with the certificates, the regulations further provided that they were subject to "be amended or revised from time to time" by the church.

Beginning in 2000, the church's membership began to wane. As the years passed, its financial difficulties mounted, and in March of 2015, the congregation concluded that it was "unable to function as a viable church" and voted to close.  The church subsequently entered into negotiations with St. Mark Coptic Orthodox Church of Boston (St. Mark) for sale of its property,

including the Churchyard.  Although St. Mark agreed to meet the asking price, it objected to taking ownership of the Churchyard as it was, largely because the Coptic Church's religious beliefs do not permit cremation.  The church ultimately agreed to disinter and relocate the cremains as a condition of the sale.[4] St. Mark took the deed to the Wayland property in 2016, and shortly thereafter it resold the property and assigned its rights under the purchase and sale agreement to Saint Philopateer Mercurius & Saint Mina Coptic Orthodox Church, Inc. (St. Philopateer).  For the same religious reasons, St. Philopateer shared St. Mark's objections to the cremains remaining on the property.

At the time of the sale of the land to St. Mark, the cremains of at least forty-nine individuals were interred in the Churchyard.  The church contacted the families of the deceased and requested their consent for relocation and reinterment of the cremains, to be undertaken at the church's expense. Although most consented, family members representing the cremains of twelve individuals (hereinafter, families) did not.[5]

---

[4] The purchase and sale agreement memorializing that term further specified that the church's obligation to remove the cremains would survive the sale's closing.

[5] The next of kin for certain interred individuals could not be located.

At an impasse, the church subsequently amended the Churchyard regulations. The newly enacted provisions specifically authorized the church to shutter the Churchyard and relocate the cremains:

> "If the Church of the Holy Spirit ceases operations or ceases operations at the property where the Churchyard Memorial Garden is located, then the Vestry or Executive Committee, as the case may be, may cause the Churchyard Memorial Garden to be discontinued or moved to an alternate location, and/or cause all cremated remains located in the Churchyard Memorial Garden to be disinterred and relocated to one or more other locations within the Diocese of Massachusetts or returned to the families of the cremains."

The church and St. Philopateer then filed a complaint in the Probate and Family Court seeking a declaration that the regulations, as amended, permitted removal of the cremains. Certain members of the families who had objected to the proposed disinterment asserted counterclaims for breach of contract, tortious interference with contractual relations, and violations of G. L. c. 93A. As those counterclaims lay beyond the court's jurisdiction, they were dismissed and refiled in the Superior Court, with an additional claim for violation of the covenant of good faith and fair dealing. The presiding Superior Court judge was then specially assigned to sit as a Probate and Family Court judge so that the two related actions could be consolidated.

Upon cross motions for summary judgment in the Probate and Family Court case, the judge entered judgment dismissing the families' claims and declaring that the church had the right to

disinter and relocate the cremains in the Churchyard.[6]  The judge reasoned that the regulations entitled the church to close the Churchyard, thereby extinguishing any common-law rights the families may have in the burial plots, which could exist only "so long as the place continues as a burial ground."  Trefry v. Younger, 226 Mass. 5, 9 (1917).  The families filed a timely appeal, and in a published opinion, the Appeals Court reversed. See Church of the Holy Spirit of Wayland v. Heinrich, 101 Mass. App. Ct. 32, 53 (2022).  We granted the church's petition for further appellate review.

Discussion.  "Summary judgment is appropriate where there is no material issue of fact in dispute and the moving party is entitled to judgment as a matter of law.  Our review of a decision on a motion for summary judgment is de novo" (quotation and citation omitted).  Le Fort Enters., Inc. v. Lantern 18, LLC, 491 Mass. 144, 148-149 (2023).

1.  The certificates.  The rights and responsibilities of the parties are governed by the language of the certificates, which are indisputably contracts.  See McAndrew v. Quirk, 329 Mass. 423, 425 (1952) (burial rights are "subject to whatever conditions were contained in the instrument [granting the] interest in the lot"); Green v. Danahy, 223 Mass. 1, 4 (1916)

---

[6] The judge also granted a parallel motion to dismiss the claims in the Superior Court case.

(applying contract principles to dispute over obligations under burial certificate).  "When the words of a contract are clear, they must be construed in their usual and ordinary sense . . . ."  General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007).  Such language, "plainly and intelligibly stated[,] . . . is the best possible evidence of the intent and meaning of those who are bound by the contract, and of those who are to receive the benefit of it."  Stackpole v. Arnold, 11 Mass. 27, 31 (1814).

The certificates are exceedingly straightforward.  They grant "right[s] of . . . interments" and state that any such right conveyed is subject to regulation by the church.[7]  Importantly, they further provide that the church may amend the regulations after the contract is executed, a right that is reiterated in the regulations themselves.  Such terms are not unique in burial contracts.  See McAndrew, 329 Mass. at 425;

---

[7] The certificates and regulations lack any language associated with property rights or covenants that run with the land.  Compare Trefry, 226 Mass. at 8 (burial rights conveyed "under seal and in the form of a grant" and "run to the grantee 'and his heirs forever'").  Cf. Feeley v. Andrews, 191 Mass. 313, 315-316 (1906) (burial easement "can be created only by grant under seal").  Although the regulations contain a reference to "perpetual care," that term is explicitly defined as "simple maintenance of the Churchyard, keeping individual lots and the Memorial Grounds free of fallen branches and trees, trimming of trees when necessary, and maintaining a path through the Churchyard."  This language evinces no intent to convey a permanent property right.

Green, 223 Mass. at 4 (certificate for burial in Catholic cemetery stated right was "subject always to the following regulations, or such others as may be from time to time prescribed").

Neither the certificates nor the regulations themselves place any limits on the nature and extent of permissible regulation of the Churchyard, and accordingly, the regulations reach a wide range of matters related to the Churchyard, including disinterment. Not only do the regulations contemplate disinterment, but by requiring the church's consent to disinter, they do so in a manner that makes clear that the church exercises control over the prospect. Further, the certificates put no constraints on the church's ability to amend the regulations as it sees fit.

In sum, there is nothing in the plain language of the certificates and attendant regulations that prohibits disinterment by the church. It was permitted under the certificates to regulate the Churchyard and amend the regulations, and it did so. Its planned course of action pursuant to the amended regulations therefore is, as a simple matter of contract law, permissible. See Green, 223 Mass. at 4 (applying contract law to conclude that, where party to burial certificate committed breach of contract, disinterment was permitted). Cf. Feeley v. Andrews, 191 Mass. 313, 316-317

(1906) (licensee could not maintain action for damages over disinterred remains).

2. Burial law. The families respond that the church's contractual authority under the certificates and regulations are circumscribed by our common law. They urge us to recognize that certain trust-like property rights are held by all families of those interred, rights that the church may not regulate out of existence by contract.

Although entanglement with State action prevents it from being squarely on point, Sohier v. Trinity Church, 109 Mass. 1 (1871), is nevertheless our most apposite case. Sohier concerned the plan of Trinity Church (Trinity) to sell its land in Boston and relocate to a new location in the city. Id. at 16-17. The prevailing law at the time compelled Trinity to obtain legislative authorization for the sale. Id. at 17.

Under Trinity's buildings were dozens of tombs, and the "representatives" of four of those tombs -- presumably family members of the deceased -- brought suit to enjoin the sale and prevent disinterment of the tombs' remains. Id. at 2, 6-9. Resolution of the matter required us to consider both the extent of the power available to Trinity, as authorized by the Legislature, and the nature of the rights held by the plaintiffs. As to Trinity, we concluded that authorization of the sale and removal of the remains was constitutional under the

Legislature's police powers, given that the Legislature had
determined that leaving the remains in place would be a danger
to public health.  Id. at 21-22.  As to the families, we noted
that burial rights are "peculiar . . . and are not very
dissimilar to rights in pews," that is, "qualified and
usufructuary right[s], being a right to occupy under certain
restrictions."  Id. at 20-21.

Weighing those qualified rights against the Legislature's
empowerment of Trinity to consummate the sale, we concluded that
Trinity was "justified in removing the bodies and remains
interred under their church."[8]  Id. at 22.  We further observed
that there were many such situations where the need of a church
to close and sell its property would permit, or even require,
any remains on that property to be relocated:

> "There are other causes which are obviously sufficient to
> authorize the removal of bodies and tombs placed under a
> church.  The edifice may be consumed by fire, or otherwise
> destroyed; or it may decay; or the place may become
> unsuitable for such a building; or for various other
> reasons it may be proper to abandon or sell it.  And in
> such cases it would be improper to leave the tombs and the
> remains deposited in them; obvious propriety would require

---

[8] In so concluding, we cited with approval several cases
from other jurisdictions that authorized disinterment under
similar circumstances.  See Sohier, 109 Mass. at 21-22, citing,
e.g., Windt v. German Reformed Church, 4 Sand. Ch. 471 (N.Y.
1847) ("it was held that the sepulture of friends and relatives
in a cemetery belonging to a religious society confers no right
or title upon the survivors, and they cannot prevent a sale of
such cemetery by the corporation and the removal of the interred
remains, when such removal is in all respects conducted
according to law").

> that the remains should be removed to some suitable place; and . . . the owners of the tombs and the friends of the deceased have no title to the lands, but only an interest in the structures and in their proper use . . . ."[9]

Id. at 22-23.

While we realize that there is no State action or authorization by the Legislature here, the same principles discussed in Sohier apply. Sohier does address the nature of the rights of decedents' families, and whatever common-law property rights the families have here can be no more extensive than those analyzed there. Applying Sohier's principles, we conclude that the failing membership and financial unviability of the Church of the Holy Spirit -- both facts that are undisputed on the summary judgment record -- make it "proper to . . . sell" the church's land and permit it to relocate the cremains as a necessary condition of that sale. Id. at 23.

This conclusion is further supported by our cases regarding pew rights, which, as Sohier pointed out, are analogues to burial rights. Pew owners are holders of "qualified, subsidiary and dependent" rights, and our law has consistently held that if a church closes "not wantonly or unreasonably or with intent to

---

[9] Presumably because of takings concerns, in this paragraph we also noted that, in relocating the remains, "the public authorities do not violate [the plaintiffs'] rights of property, if proper provision is made for compensation or substitution." As the Church of the Holy Spirit is a private actor, no similar issue arises here.

injure the pew holders . . . , the pew owner is without remedy."
Massachusetts Baptist Missionary Soc'y v. Bowdoin Sq. Baptist
Soc'y, 212 Mass. 198, 200-201 (1912) (collecting cases).
Indeed, we have held this to be true in cases of church closure
due to failing membership:

> "Now as every member of a religious society may at any time
> dissolve his membership at his pleasure, it may often
> happen that the members of a religious society may withdraw
> therefrom in such numbers as to disable the society to
> maintain public worship; and when a religious society or
> parish is thus disabled, it is clear that the pewholders
> would have no cause of complaint if the society or parish
> should abandon their meetinghouse, and wholly cease to
> occupy it as a place of public worship."

Fassett v. First Parish in Boylston, 19 Pick. 361, 363 (1837).

Review of our limited cases addressing burial rights
reveals no common-law rights of the kind asserted by the
families.[10]  Given this lack of Massachusetts authority, the
families urge us to adopt the reasoning of Hines v. State, 126
Tenn. 1 (1911).  In Hines, the Tennessee Supreme Court examined

---

[10] The next closest case we can identify is Messina v.
LaRosa, 337 Mass. 438 (1958), where a decedent's second wife
scrubbed the deceased first wife's dates of birth and death off
of the family tombstone and relocated it to a new plot for her
own use.  Id. at 440.  The second wife changed the dates on the
tombstone, and not the name, because -- improbably -- both women
were named Josephine LaRosa.  Id. at 438-440.  We acknowledged
that the first wife's sister had standing to sue for restoration
of the tombstone based on the sensational facts of the case,
tellingly disclaiming reliance on any generally applicable
common-law rights:  "This [holding] is not an application of any
rule of property law, but is a recognition of principles of
ethics, propriety, and common decency which equity is peculiarly
qualified to enforce."  Id. at 442.

the rights of family members in a family burial plot on land that had passed from family ownership to strangers. It held that the family had the right to access and maintain the plot, proclaiming the existence of trust-like rights:

> "When land has been definitely appropriated to burial purposes, it cannot be conveyed or devised as other property, so as to interfere with the use and purposes to which it has been devoted. When once dedicated to burial purposes, and interments have there been made, the then owner holds the title to some extent in trust for the benefit of those entitled to burial in it, and the heir at law, devisee, or vendee takes the property subject to this trust."

Id. at 4-5.

Even if we were to put aside that the certificate and regulations control, and Sohier's teaching that no common-law rights preclude disinterment here, we would still think that Hines is a poor fit for the case at bar.[11] The land at issue there was a small family burial plot, those interred there were buried when an individual in the family was its fee owner, and the context of the discussion was a criminal prosecution. The dispute was not between a church and parishioners over burial in a churchyard, and there was no governing contract or

---

[11] Hines was considered by the Appeals Court in Sanford v. Vinal, 28 Mass. App. Ct. 476 (1990), on facts that were much more similar than those of this case. The Sanford court never reached the issue whether Massachusetts should adopt Hines, however, because the family burial plot in question had been so long abandoned that it could not be located. See id. at 486-487.

certificate, nor any regulations authorized by such a contract.
Moreover, Hines no longer even governs burial ground closures
and disinterment in its home State, having been superseded by
statute.[12]  See Tenn. Code Ann. §§ 46-4-101 et seq. (establishing
statutory scheme for closing burial grounds and relocating
remains).

We see no need to adopt Hines here, where we may
comfortably decide the case by applying Massachusetts law.
Nowhere does our law forbid the Church of the Holy Spirit from
disinterring the cremains in the Churchyard.  Rather, the
closest analogues in our case law provide that this is the type
of situation where relocation of the cremains is proper.[13]  See
Sohier, 109 Mass. at 22-23.

---

[12] In a concurrence in an earlier case, Chief Justice John
Shields, the author of Hines, opined that burial grounds'
"sacred character" rendered them "forever withdrawn from all the
incidents to which other real estate may be liable," including
eminent domain.  See Memphis State Line R.R. v. Forest Hill
Cemetery Co., 116 Tenn. 400, 422 (1906).  Chief Justice Shields
was buried in a family plot on his estate in 1934, and just a
few years after his passing, his remains were disinterred and
relocated when the Tennessee Valley Authority built the Cherokee
Dam and flooded the area.  See Paine, Cemetery Law:  Moving
Chief Justice Shields, 49 Tenn. B.J. 35 (Sept. 2013).

[13] In light of this conclusion, we also reject the families'
argument that the church's amendment of the Churchyard
regulations violated the covenant of good faith and fair
dealing.  Cf. T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456
Mass. 562, 573 (2010).

In other circumstances, a different result might obtain. As with past disputes over burial rights, future disputes will turn on the particulars of each case, including the language of the instrument granting the rights, see Feeley, 191 Mass. at 316-317 (documents in evidence established, at best, revocable license to be buried); the relationship between the parties, see G. L. c. 114, § 32 (establishing statutory right to burial "in any burial lot or tomb of which [one's] spouse was seized at any time during marriage"); the status of the burial ground, see Sohier, 109 Mass. at 21-23; and any other relevant equitable considerations, see Messina v. LaRosa, 337 Mass. 438, 442 (1958). On the particulars of the case before us, summary judgment was properly granted.[14]

Conclusion. Although we resolve this case by applying long-standing legal principles, we, of course, recognize the human element involved. We also reiterate that in other circumstances a different result might obtain. Disinterring the remains of one's ancestors will forever be a sensitive, difficult prospect. To repeat our words from Antoniewicz v. Del Prete, 340 Mass. 742, 743 (1960):

---

[14] As we decide the case on nonconstitutional grounds, we need not consider the argument that a declaration that the cremains may stay in place would violate the church's or St. Philopateer's constitutional right to the free exercise of religion.

"The court is fully aware that a decent respect for the memory of those who have been buried requires that there be no disturbance of the remains of one deceased unless the law as applied to the particular circumstances compels such a conclusion.  Here, with considerable reluctance, that conclusion seems necessary to the court."

The judgments of the Superior Court are affirmed.[15]

<u>So ordered</u>.

---

[15] The Superior Court's declaration included certain deadlines for compliance.  Should the parties believe that the terms of the declaration require modification owing to the interval between its initial entry and entry of the rescript from this court, they may move for modification in the Superior Court.