## UNION PAC. R. CO. v. COMMISSIONER OF INTERNAL REVENUE. *
### No. 7.

Circuit Court of Appeals, Second Circuit.

Feb. 13, 1934.

Henry W. Clark, of New York City, for petitioner.

Sewall Key and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and AUGUS-TUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The proceedings before the Board involved numerous controverted issues, of which only two have survived for review by this court. These two issues are entirely distinct. The one first to be considered relates to the taxpayer's claimed deduction of a loss incurred upon an exchange of bonds in the year 1921. The deduction was disallowed by the Commissioner and by the Board. The amount of the tax involved is more than five hundred thousand dollars.

Prior to the exchange of bonds hereafter

*For opinion denying rehearing and modifying opinion, see 69 F.(2d) 966.

to be described, the petitioner (for convenience referred to as Union Pacific) owned all the capital stock of Oregon Short Line Railroad Company, which in turn owned (1) all the capital stock of Oregon-Washington Railroad & Navigation Company (referred to as Navigation), and (2) one half the capital stock and one half the outstanding bonds of Los Angeles & Salt Lake Railroad Company (referred to as Salt Lake). The other half of Salt Lake stock and bonds was owned by Senator William A. Clark and members of his family. Under date of April 27, 1921, Union Pacific contracted with Senator Clark to buy at $20 per share the Salt Lake stock owned by him and his family and to exchange for Salt Lake bonds certain bonds owned by Union Pacific, namely, Navigation bonds, Southern Pacific Railroad bonds, and San Francisco Terminal bonds. The cost to Union Pacific of the bonds it gave was $26,000,000, in round figures, and the market value of the Salt Lake bonds received in exchange was about $21,000,000. The difference, namely, $5,243,312.99, the petitioner claims as a loss deductible from gross income for 1921; while the Commissioner contends, and the Board held, that no loss can be recognized because of section 202 (c) (1) of the Revenue Act of 1921 (42 Stat. 229, 230). This section reads as follows:

"(c) For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

"(1) When any such property held for investment, or for productive use in trade or business (not including stock-in-trade or other property held primarily for sale), is exchanged for property of a like kind or use."

The dispute is whether, within the meaning of this statute, the bonds which Union Pacific disposed of were "property held for investment" and whether the Salt Lake bonds received in exchange were "property of a like kind or use." The Board found that the bonds given were held for investment and the bonds received were acquired for investment. These findings, the petitioner urges, are wholly without support in the evidence.

It is admitted that the Southern Pacific bonds and the Terminal bonds were held for investment, but it is contended that the Navigation bonds were "held primarily for sale." They were acquired by Union Pacific in 1914 from its wholly owned subsidiary, Oregon Short Line, having been issued in that year to anticipate possible state legislation which might impose burdensome restrictions on the issuance of securities. Union Pacific contemplated selling them at some future time, perhaps adding its own guaranty. From the time of their acquisition there was no satisfactory market for 4 per cent. bonds, and, as Union Pacific had other resources, it continued to hold them until the time of the exchange in 1921. The Board held that the petitioner had the burden of proving that the Navigation bonds were not held by it for investment, and that the foregoing facts were insufficient to so prove.

In making its contract with Senator Clark, Union Pacific had two objects in view. It desired to obtain exclusive operating control of the Salt Lake Railroad, and it desired to better its position for future financing when needed. By acquiring one-half of the outstanding Salt Lake bonds, the remaining bonds being owned by Oregon Short Line, its subsidiary, it would be able at any time in the future when new financing was desirable to cancel the entire Salt Lake bond issue and thus have 1,000 miles of railroad available for a new first lien mortgage. It was never contemplated that the Salt Lake bonds would be sold, and they were still on hand at the time of the hearing before the Board in December, 1931.

We think the Board was clearly correct in holding that the Salt Lake bonds were acquired for investment. Although one object in getting them was to be able to float a larger first mortgage should occasion arise, there was no refinancing plan on foot, and no one could foretell when the time would arrive. For ten years at least it did not. Meanwhile, the bonds were producing income, and the fact that they would produce income while held could not have been utterly ignored in acquiring them; the possible prospective purpose does not cancel the immediate and actual one. Property had been exchanged for income producing bonds which were to be held for an indefinite period. This was an investment in the ordinary sense. It involved "a conversion of wealth from one form into another suitable for employment in the making of the hoped-for gains." La Belle Iron Works v. United States, 256 U. S. 377, 388, 41 S. Ct. 528, 530, 65 L. Ed. 998. Moreover, the acquisition of the bonds was inextricably tied to the acquisition of the Salt Lake stock under the April contract.

That such purchase of stock was an investment could scarcely be questioned; and it would be difficult to ascribe a different character to purchase of the bonds under the same contract. If one bought income producing improved real estate, it would hardly be argued that he made an investment in the land but not in the improvements, because he intended at some unknown future date to tear them down.

Since the Salt Lake bonds were acquired for investment, no loss can be "recognized" as resulting from the transaction in so far as they were exchanged for Southern Pacific and Terminal bonds, admittedly held for investment. In so far as they were exchanged for Navigation bonds, the question is whether the latter were held for investment.

■■ They were issued against the chance that legislation would impede issuing them later; Union Pacific wanted them ready to sell. But they had been held for seven years without sale, and no one knows how long they might have been held had not the opportunity arisen to make this exchange. If one not a dealer in securities buys income producing bonds for the purpose of sale at some unknown future time when a favorable price can be realized or the owner's need for cash may require, it seems to us that in the common acceptation of the word he makes an "investment," and the bonds are "property held for investment" within the meaning of the statute. The parenthetical clause of the section under consideration, which contains the phrase "property held primarily for sale," refers, in our opinion, only to the words immediately preceding the parenthesis, that is, property held "for productive use in trade or business." This construction is not only more consistent with the punctuation of the paragraph, there being a comma after the word "investment" and at the end of the parenthesis, but it also finds corroboration in the form of the 1923 amendment of section 202 (c) (1), 42 Stat. 1560, which expands the parenthesis as shown below:

"(1) When any such property held for investment, or for productive use in trade or business (not including stock-in-trade or other property held primarily for sale, and in the case of property held for investment not including stock, bonds * * * or evidences of indebtedness or interest), is exchanged for property of a like kind or use."

The modification of this phraseology in the Revenue Act 1924, § 203 (b) (1), 43 Stat. 256, 26 USCA § 934 (b) (1), does not, we think, materially weaken the argument for this construction.

■■ It is urged that the bonds of a wholly owned subsidiary are never held by the parent company for investment; that the holding of such bonds gives the parent company no investment which it would not otherwise have because the stock ownership of the subsidiary assures the parent realization of any net income of the subsidiary, and it is immaterial whether such income is realized by way of dividends or of interest on the bonds. The testimony was that, if interest was paid on the Navigation bonds, the payment would be evidenced simply by an entry in the open account between the companies. We cannot accede to this argument. When money of the parent corporation is loaned to the subsidiary in return for its obligation evidenced by bonds, the corporations are intended to be treated as distinct legal entities; the stock ownership of the subsidiary is immaterial. Within the meaning of the section under consideration, the purchase of bonds or stock of a subsidiary is an "investment" as much as would be a similar purchase of bonds or stock of any unrelated corporation. We conclude, therefore, that the Navigation bonds were held by Union Pacific for investment; hence no loss can be "recognized" on the exchange.

The foregoing conclusions make it unnecessary to consider the petitioner's argument that the phrase "like kind or use" is to be read conjunctively as "like kind and use."

■ In approving the decision of the Board as to the first issue raised by this appeal we are not unmindful of the unfortunate situation in which the petitioner was placed by virtue of the retroactive feature of the Revenue Act of 1921. Had the transaction occurred earlier than 1921, there is no doubt that the petitioner would have sustained a deductible loss, for the prior taxing acts contained no provision corresponding to the above-quoted section 202 (c) (1). Had the exchange been made subsequent to 1922, the loss would likewise have been deductible, for by the amendment already referred to the section was soon made inapplicable to an exchange of bonds. It is only because the Revenue Act of 1921, approved in November of that year, was made retroactive to January 1st, that the present dispute exists. Had the statute been enacted before the contract of April 27th was made, the transaction could easily have been so arranged that no question as to deducting the loss would have arisen. These considerations may elicit sympathy for the taxpayer, but they cannot

be treated as relevant to a construction of the statutory language upon which decision of the controversy must hinge.

■ The second issue relates to the deduction in each of the taxable years under review of amortization of commissions on sales of bonds prior to 1913. Before 1909 Union Pacific and its subsidiary Oregon Short Line sold several issues of bonds at a discount and paid commissions to bankers for making or underwriting the sales. In the taxable years under review deductions were claimed for these discounts and commissions amortized over the life of the bonds. The Board of Tax Appeals allowed the deductions claimed on account of bond discount, but disallowed the deductions claimed on account of commissions. The latter amount to approximately $57,000 in each of the four years in question.

The petitioner argues with persuasive force that commissions should be dealt with on the same basis as discount; that it is immaterial whether corporate bonds are sold at a 4 per cent. discount, with a 2 per cent. commission paid to the bankers for selling or underwriting services, or are marketed at a 6 per cent. discount, with no payment of commission. In either case the corporation receives but $94 for each $100 which it promises to repay at maturity of the bond, and, when payment is made, a loss of $6 will be sustained; or, if incurring the obligation is considered as a realization of the loss, it will be sustained when the bond is issued. But to charge the whole loss to the business of the single year, either of issue or of payment, is contrary to recognized accounting practice and unfairly distorts the income for that year. Hence the accepted practice is to amortize it over the life of the bond.

The taxing authorities recognized this practice at an early date. In Regulations 33 (Revised), article 150 provided as follows:

"Art. 150: In cases wherein a corporation sells its bonds at a discount plus a commission for selling, the amount of such discount and commission, together with other expenses incidental to issuing the bonds, constitute a loss, the aggregate amount of which loss will, for the purpose of an income tax return, be pro-rated over the life of the bonds sold, and the amount thus apportioned to each year will be deductible from the gross income of each year until the bonds shall have been redeemed."

Regulations 45, art. 544, and Regulations 62, art. 545, relating respectively to the 1918

act and the 1921 act, contain a similar provision as to amortizing bond discount but omit any express reference to amortizing commissions or other expenses incidental to issuing the bonds. The practice of the Bureau, however, does not distinguish between discount and commissions and expenses with respect to bonds issued subsequent to 1913. 4 C. B. 276; 4 C. B. 129; I—2 C. B. 91; IV—1 C. B. 145; III—2 C. B. 245. In Western Maryland Ry. Co. v. Commissioner of Internal Revenue, 33 F.(2d) 695 (C. C. A. 4), it was held that the deduction in current tax years of amortization of bond discount must be recognized as well when the bonds were sold before the enactment of the income tax laws as when sold after. The Board had held the same in the Chicago, Rock Island & Pac. R. R. Co. v. Commissioner of Internal Revenue, 13 B. T. A. 988, 1027. There it was also held that expenses incurred in issuing bonds subsequent to 1913 should be amortized and deducted (page 1035), but that no such deductions could be allowed for incidental expenses with respect to bonds issued prior to 1913 (page 1034). This was affirmed in Chicago, R. I. & P. Ry. Co. v. Com'r, 47 F.(2d) 990, 991 (C. C. A. 7). The precise nature of the expenses and whether they included commissions does not appear. The reason given by the Board for this distinction is stated at page 1035 of 13 B. T. A.:

"* * * We are of opinion that since the Circuit Court of Appeals [26 F.(2d) 408] has held in the Old Colony Railroad Co. Case [6 B. T. A. 1025], supra, that premiums actually received prior to March 1, 1913, are not taxable income, by the same token, expenses actually paid prior to said date are not deductible from gross income of taxable years."

It is not easy to select the precise provision of the statute which authorizes amortization and deduction either of bond discount or bond commissions. The petitioner has not attempted to pin its flag to a single specific phrase. Section 234 is the relevant section in both the Revenue Act of 1918 (40 Stat. 1077) and the Revenue Act of 1921 (42 Stat. 254). Separate paragraphs authorize the deduction from gross income of "ordinary and necessary expenses paid or incurred during the taxable year," of "interest paid or accrued," of "losses sustained," and of depreciation and exhaustion. Bond discount and commissions scarcely fall within the first category; they represent the cost of acquiring new capital, rather than an or-

dinary and necessary expense in carrying on business during the year. Discount is often referred to as deferred interest, and deduction of amortized discount has been allowed under the "interest" paragraph. See Western Maryland Case, supra. To us the "loss sustained" paragraph seems the more appropriate. Viewing discount and commissions as the cost of acquiring new capital, the loss is actually sustained when the bonds are paid or redeemed; but, since the use of the capital is extended over the life of the bonds, the income for any current year will be more fairly reflected by prorating the loss over the period of such use. So the Regulations provide, and, since the loss is really suffered when the bond is paid, that is, at a time when an income tax law is in effect and hence at a time when the taxing officials may require the loss to be spread so as truly to reflect annual income, it is immaterial that the bonds were issued before the income tax amendment. The analogies of depreciation deductions are persuasive. Rent or insurance paid in advance prior to 1913, or the purchase price of a wasting capital asset, such as a patent, would certainly be prorated over the years affected. See O. D. 720; 3 C. B. 145; T. D. 3414; Reg. 45, arts. 163, 165, 168. A broker's commission for finding a tenant is required to be spread over the life of the lease on the theory that it is a cost of acquiring a wasting asset. See Bonwit Teller & Co. v. Com'r, 53 F.(2d) 381, 384, 82 A. L. R. 325 (C. C. A. 2). The commission there involved was paid after the income tax laws were effective, but the theory would be equally applicable had it been paid prior to 1913. It is true that in these analogous cases, the payment has resulted in acquiring an asset which year by year is exhausted; while in issuing bonds no wasting asset is acquired—rather, a liability has been incurred which upon maturity will result in loss. Concededly that loss must be spread so far as it represents bond discount. We see no reason why the other element of that loss, bond commissions, should not be treated in the same way. Premiums on bonds issued prior to 1913 cannot be spread over the life of the bonds to enhance income. Old Colony R. R. Co. v. Com'r, 284 U. S. 552, 52 S. Ct. 211, 76 L. Ed. 484. This is because the premium was received prior to the Sixteenth Amendment and could not be affected by a subsequent taxing act; hence the amortization requirement of the Treasury Regulations was ineffective to declare it income for subsequent years. As applied to discount, the Regulations raise no constitutional question; the loss is actually sustained after the Sixteenth Amendment became effective, and a requirement that it be amortized for purposes of deduction from gross income is entirely valid. Similarly as to commissions, which like discount are paid out of the new capital acquired by the issuance of bonds and do not result in actual loss until the bonds are paid.

Accordingly, the decision as to bond commissions is reversed, and the cause is remanded to the Board of Tax Appeals for further proceedings in harmony with this opinion.