DOWNER & COMPANY, LLC vs. STI HOLDING, INC.,
& another.[1]

No. 09-P-1105.

Norfolk. January 19, 2010. - May 27, 2010.

Present: BERRY, RUBIN, & MILKEY, JJ.

*Contract,* Construction of contract, What constitutes, Performance and breach.
*Practice, Civil,* Summary judgment. *Damages,* Breach of contract, Interest.

In a civil action arising from a dispute over how much compensation the
defendants owed under a contract in which they had engaged the plaintiff,
an investment banking firm, to assist them in raising new capital, the judge
erred in asking the jury to determine whether the defendants' refusal to pay
the plaintiff certain contingent transaction fees for a third party's purchase
of existing stock pursuant to an unsolicited tender offer was a breach of
the contract, where the unambiguous terms of the contract's compensation
provision, read in context, demonstrated that the third party's tender offer,
made as part of a takeover bid, did not fall within the scope of what the
plaintiff was hired to accomplish, and that the purchase of existing stock,
which did not provide the plaintiff with any of the capital that the contract
was intended to raise, was not the type of transaction for which the defend-
ants would owe the plaintiff a contingent fee [791-794]; further, the third
party's purchase of loans from the defendants' creditors could not be viewed
as an equity or debt investment for which a fee was due [794-795]; however,
cash advances provided by the third party to the defendants provided expan-
sion capital for which fees were due the plaintiff, as calculated on the
maximum balance that the third party allowed the defendants to draw over
the course of one year [795-797].

CIVIL ACTION commenced in the Superior Court Department on
August 19, 2002.

A motion for summary judgment was heard by *Paul A. Cher-
noff,* J., and the case was tried before *John P. Connor, Jr.,* J.

*Joseph F. Shea* for the defendants.

*Timothy J. Langella (Steven J. Torres* with him) for the plaintiff.

MILKEY, J. Defendant Separation Technologies, Inc., engaged

---

[1] Separation Technologies, Inc.

the plaintiff, an investment banking firm, to assist it in raising capital. Events played out in an unanticipated fashion, which led to a dispute over how much compensation the defendants owed the plaintiff under the contract. After trial, a Superior Court jury awarded the plaintiff approximately $2.26 million dollars in contractual damages (in addition to the $214,773 in compensation that had already been paid). The judge partially granted the defendants' motion for judgment notwithstanding the verdict (judgment n.o.v.), thereby reducing the jury award to approximately $1.46 million. On cross appeals, we affirm in part and reverse in part.

*Background.*[2] The defendants are Separation Technologies, Inc. (STI), and its holding company, STI Holding, Inc. (STI Holding).[3] STI developed technology to convert fly ash (a by-product of the combustion of coal) into a useful product for the ready-mix concrete industry. Between 1994 and 2001, STI installed its equipment on a commercial scale at three coal-fired power plants. By 2001, STI's principals had already begun thinking about "exit strategies," through which they could sell the company and thereby cash out their interests. However, in light of the company's limited track record of success, the principals decided that they needed to expand the business in order to make it a more attractive target of acquisition, with the potential sale of the company several years away. Therefore, with a specific goal of raising at least ten million dollars in capital, STI hired plaintiff Downer & Company, LLC (Downer), to assist with a "private placement of equity and/or debt."

On May 25, 2001, STI and Downer entered into a written contract that described the tasks Downer was to perform and explained how it was to be paid. Under the compensation provisions, Downer was to receive a monthly fee and reimbursement

---

[2]Because the plaintiff prevailed at trial, we take the facts in the light most favorable to it. See, e.g., *Mullins* v. *Pine Manor College*, 389 Mass. 47, 56 (1983). However, even though the trial lasted over two weeks, the parties do not dispute the key facts.

[3]STI Holding owned 100% of STI (its sole asset) and it had no employees. There was uncontradicted testimony at trial that STI and STI Holding were converted into limited liability companies in 2003, and that they were subsequently merged into a single entity, Separation Technologies, LLC. Neither side has addressed that change of status in its briefs, and we therefore assume that no material consequences flow from it.

of its expenses. The contract also required STI to pay a "contingent transaction fee" for "each completed equity or debt investment in STI." Specifically, STI was required to pay Downer five percent of the "equity and/or debt raised," plus warrants on stock or other equity securities issued.[4] For a fee to be due, the transaction had to occur during the term of the agreement or in a twelve-month "tail period" after the agreement was terminated. Downer did not have to prove that any transactions covered by the agreement specifically resulted from its efforts.[5] STI retained control over whether to accept any offers.

On STI's behalf, Downer prepared an "offering memorandum" to solicit bids from potential investors interested in providing the capital STI was seeking. In response to its marketing efforts, Downer received two equity financing proposals and one debt financing proposal.[6] STI eventually began to focus on the debt financing proposal, which was from Eureka Growth Partners (Eureka). The Eureka proposal would have provided STI with at least seven million dollars in new capital.

During this period, a representative of Titan America LLC (Titan), sat on STI's board of directors. Titan owned twenty percent of STI Holding's shares.[7] It strongly opposed Eureka's proposal, because it thought the interest rate Eureka was seeking was too high and that the proposal made economic sense only if STI grew at a rate that Titan viewed as unrealistic. Titan

---

[4]Where contingent transaction fees were due, the baseline professional fees were to be credited against the transaction fees as follows: "Professional services fees paid Downer & Company will be credited against the cash component of the Transaction Fee provided professional services fees are paid through the close of the transaction and provided the cash Transaction Fee after credit backs (the Net Cash Transaction Fee) is at least $300,000."

[5]The agreement provided that a fee was due Downer on any investment "made by any equity and/or debt source identified and actively solicited by Downer . . . on behalf of STI *or any equity and/or debt source who contacted STI before the termination of the professional services arrangement*" (emphasis supplied).

[6]Equity financing raises money through the sale of an ownership interest in a company, while debt financing raises money through a loan. Black's Law Dictionary 707 (2009).

[7]After it installed its equipment at coal-fired power plants, STI retained an interest in the processed fly ash and sold it to ready-mix concrete manufacturers. Titan owned a ready-mix concrete manufacturer that was one of STI's main customers.

was also concerned about the dilution of the value of its owner-ship interest that would result from STI's accepting outside financing. Faced with Eureka's offer, Titan made a competing debt financing proposal to STI. Its offer was similar to Eureka's although at a lower interest rate. However, consistent with its more conservative view of STI's short-term growth potential, Titan offered to loan STI far less money than Eureka: two and one-half million dollars for the first year, with another two and one-half million to be available thereafter if STI met certain to-be-agreed-upon performance goals. STI's board rejected Titan's proposal in favor of signing a nonbinding term sheet with Eureka.

Before STI consummated its contemplated financing deal with Eureka, Downer sought to convince Titan to participate in the Eureka proposal (which had been structured so that other investors, including existing shareholders, could provide up to five million dollars in addition to the seven million that Eureka was to provide). Titan considered putting up three million dol-lars toward this end, but ultimately rejected the option. Instead, Titan decided to attempt a takeover of the company. To accom-plish this, Titan, on June 28, 2002, made a "tender offer" to the other existing STI Holding shareholders, offering to buy out all of their shares at a set price. The tender offer took both STI and Downer by surprise. As Downer conceded during its closing argument at trial, no one had thought that such an option was possible in the relevant time frame.

Downer provided to STI's principals an evaluation of the tender offer, and it helped them prepare a counteroffer as the negotiations rapidly developed. As Titan's takeover of STI became increasingly likely, Downer became concerned over how it would be compensated. On July 3, 2002, Downer informed STI that it still expected contingent transaction fees in addition to its monthly compensation and expenses if Titan's tender offer was successful.[8] On July 8, 2002, Downer sent STI a preliminary invoice stating what it expected to be paid. After reviewing the matter with counsel, STI concluded that its interests were no

---

[8]The parties stipulated that STI paid all of Downer's base monthly compensa-tion (which totaled $214,773) and all of Downer's expenses (which totaled $11,758).

longer aligned with Downer's,[9] and it terminated the contract on July 10, 2002, effective August 9, 2002.

Following some additional negotiations, Titan's tender offer was accepted, and Titan obtained full ownership and control of both STI and STI Holding on or about August 15, 2002. Downer expanded its demands to include transaction fees on all of the money that Titan paid to acquire STI,[10] and it eventually demanded additional contingent fees on certain transactions that Titan made after taking control of the company. Those transactions were of two distinct types. One was Titan's purchase of two loans from STI's creditors (totaling $5,179,541). The other was for cash advances that Titan provided STI during the one-year "tail period." The parties do not dispute that Titan frequently made cash advances to STI in that period, and that STI frequently made transfers back to Titan. Throughout the year in question, STI always owed money to Titan, with the highest running balance at just over three million dollars ($3,000,063). Downer demanded a transaction fee on $10,427,212, the total of all the cash transfers Titan made to STI, without consideration of the payments STI regularly made in the opposite direction.

STI refused to pay the contingent transaction fees, and Downer brought a breach of contract claim against both STI and STI Holding.[11] After an eleven-day trial, the jury found both defendants liable and awarded damages of $2,261,000.[12] The defendants filed a motion for judgment n.o.v. through which they

[9]At trial, STI suggested that Downer was actively seeking to undercut the tender offer so that the Eureka deal could go through. Its evidence to support this was excluded and, in any event, Downer prevailed before the jury. It remains undeniable, however, that the unexpected tender offer complicated what had been a fairly straightforward alignment of interests.

[10]As part of the sale, Titan also purchased outstanding stock options and paid accumulated dividends on preferred stock. According to Downer's lead witness, Titan paid a total of $29,113,448 to acquire STI.

[11]In addition to its breach of contract claim, Downer brought four other counts. The judge dismissed Downer's declaratory judgment claim after trial. The jury ruled in the defendants' favor with regard to Downer's claim for breach of the covenant of good faith and fair dealing and its claim for unjust enrichment. The jury also issued an advisory ruling in the defendants' favor as to Downer's claim brought pursuant to G. L. c. 93A, which the judge adopted. None of these other claims remains live.

[12]The jury awarded a lump sum, and they did not specify how they arrived at this figure. In its closing argument, Downer requested "a little over $2.2

argued that, as a matter of law, no contingent transaction fees were owed under the contract.[13] The judge denied the judgment n.o.v. motion in part and granted it in part. Specifically, he allowed to stand the portion of the jury verdict that corresponded to the tender offer (and related pre-acquisition payments), while voiding the remainder of the award, which was evidently based on the postacquisition transactions.[14] The judge also granted the same relief through conditionally allowing the defendants' motion for a new trial unless Downer accepted a remittitur (which it did). Both parties appealed.

*Discussion. STI's appeal.* The defendants argue that, as a matter of law, they owe no contingent transaction fee for Titan's purchase of existing stock from the other STI Holding shareholders. According to them, the unambiguous terms of the contract did not encompass these transactions, and the judge should never have asked the jury to determine whether the defendants' refusal to pay the corresponding contingent transaction fee was a breach of contract.[15] We agree.

---

million," based on five percent of the total that Titan paid to acquire STI (see note 10, *supra*), plus five percent of the postacquisition transactions. It is thus evident that the jury essentially provided Downer all it was requesting, and the judge and both parties credit the jury with relying on the theory of damages that Downer put forward. Neither side addresses the slight discrepancies between the amount the jury awarded and the result achieved from applying the formula that Downer endorsed to the figures that the witnesses presented. Also apparently lost in the mix are the questions whether and how the professional fees that STI paid were to be credited against the contingent transaction fees due. See note 4, *supra*. STI did not highlight this issue to the jury, and it did not raise it either in its posttrial motions or on appeal. The issue therefore has been waived. See *Budish* v. *Daniel*, 417 Mass. 574, 577 n.5 (1994).

[13]Prior to the filing of the judgment n.o.v., the defendants made largely the same arguments through motions for directed verdicts and various pretrial motions. We are unpersuaded by Downer's arguments that, at the time the judge ruled on the judgment n.o.v., the defendants had not adequately preserved the issues on which the judge relied in upholding the jury verdict on the tender offer.

[14]The judge allowed $1,455,672 of the jury award to stand. He derived this number by taking five percent of the total amount that Titan paid to acquire full ownership of STI Holding (see note 10, *supra*).

[15]Strictly speaking, the tender offer involved the shares of STI Holding, not STI itself. By way of special verdict, the jury specifically concluded that STI Holding was a party to the contract between STI (its wholly-owned subsidiary) and Downer even though STI Holding was not expressly named. The defendants argue that this was erroneous as a matter of law, although they are

Whether a contract is ambiguous is a question of law that we address de novo. *Basis Technology Corp.* v. *Amazon.com, Inc.,* 71 Mass. App. Ct. 29, 36 (2008). See *Targus Group Intl., Inc.* v. *Sherman, ante* 421, 428 (2010) ("The interpretation of a contested written contract is a question of law ordinarily appropriate for disposition by summary judgment"), citing *Lumber Mut. Ins. Co.* v. *Zoltek Corp.,* 419 Mass. 704, 707 (1995); *LoCicero* v. *Hartford Ins. Group,* 25 Mass. App. Ct. 339, 341 (1988).

To support its interpretation of the compensation provision, Downer focuses principally on the phrase "each completed equity or debt investment in STI." Downer argues that this term is broad enough to encompass Titan's purchase of existing STI Holding stock. Such an interpretation is indeed possible if the language is taken out of context and read in isolation.[16] However, meaning and ambiguity are creatures of context. See *Starr* v. *Fordham,* 420 Mass. 178, 190 & n.11 (1995) (contractual language must be read in context). In interpreting a contract, " '[t]he objective is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.' " *Sullivan* v. *Southland Life Ins. Co.,* 67 Mass. App. Ct. 439, 442 (2006), quoting from *Massachusetts Property Ins. Underwriting Assn.* v. *Wynn,* 60 Mass. App. Ct. 824, 827 (2004). Reading the language in context dooms Downer's view.

The parties do not dispute that STI engaged Downer to assist it in raising the new capital needed to allow the company to expand. This purpose is reflected in language used throughout the contract. For example, the contract refers to transactions made in "this financing round," and Downer conceded at trial that "financing" necessarily refers to raising capital.[17] The compensation provision itself also reflects this mission by stating

---

somewhat strained to explain why this matters. STI conceded below that it is irrelevant whether any financing received by STI went directly to the company or was funneled through STI Holding. For purposes of our analysis, we treat STI and STI Holding interchangeably, as the parties did throughout their relationship. Further, as noted above, STI and STI Holding have since merged into a single limited liability company. See note 3, *supra.*

[16]Thus, for example, one who buys stock in a company can be said to have made an equity investment in that company.

[17]Through citations to business literature, STI argues that the use of the term "private placement" itself necessarily indicates that Downer's assigned

that the five percent fee was due on "equity and/or debt *raised*" (emphasis added). Given the stated purpose for which Downer was retained, we believe that the parties intended that a transaction fee be paid for those transactions that "raised" funds for STI (whether provided directly to STI, or funneled to STI through STI Holding).[18]

Titan's takeover, by itself, raised no new capital for STI (or STI Holding).[19] The money that Titan paid instead went to the outgoing shareholders who seized the unanticipated opportunity to cash out.[20] We conclude that the tender offer did not fall within the scope of what Downer was hired to accomplish and that Titan's purchase of the existing stock was not the type of transaction for which STI would owe Downer a contingent fee. A contrary interpretation would deprive STI of the benefit of its bargain by binding it to pay a contingent fee on transactions that provided the company none of the capital that the contract was intended to raise.[21]

---

task was to help raise capital for STI through the issuance of new securities. See, e.g., Commercial Bank Private Placement Advisory Services: The Legal and Public Policy Issues, 95 Banking L.J. 333 (1978) (referring to "private placement" as "the direct sale of securities by a corporation or other business entity to a limited number of sophisticated investors"). At trial, however, STI's own outside transactional counsel acknowledged that the term "private placement" could be used in relation to the sale of existing stock. We therefore do not rely on the use of the term "private placement." We note, however, that the contract states that the private placement was "for" STI, which indicates that Downer was hired to place securities directly for the company, not to sell existing shares for STI shareholders.

[18]As noted above, neither side thought a sale of the company was feasible in the relevant time frame. Therefore, in interpreting the parties' intent as to what transactions were covered by their agreement, the STI principals' long-term aspirations were beside the point.

[19]Downer conceded this point at trial. It did make a passing suggestion that Titan's funding of the accumulated unpaid dividends on preferred stock and its purchase of outstanding stock options nevertheless improved STI's balance sheet by paying off standing liabilities. Downer did not develop the argument further. Nor did Downer frame the issue to the jury in closing argument, electing instead to "roll the dice" by arguing that a fee was due on all sums Titan paid to acquire STI. Further, Downer has not raised the argument on appeal, and we decline to reach it.

[20]That the outgoing shareholders may have fared better than they may have initially expected is not material given that these individuals or entities were not themselves parties to the contract or this litigation.

[21]Such an interpretation would also render STI liable to pay a fee for sales of existing stock even though STI itself generally had little control over

This is not to say that there must be perfect congruity between the scope of work portion of the contract and the compensation provisions. Certainly, the parties were free to draft the compensation provisions with a broader brush in order to allow Downer to receive appropriate compensation when it fulfilled its part of the bargain in ways that were not specifically foreseen. But that is very different from concluding that Downer should be paid "contingent" compensation regardless of whether STI received the benefits that it reasonably expected under the contract.

*Downer's cross appeal.* Downer argues that the judge erred by reducing the jury verdict, and that it is entitled to a contingent fee for the postacquisition transactions even if one is not due for the tender offer itself.[22] We agree in part.

When it purchased the two notes on which STI owed debts to third parties, Titan did not cancel STI's debt. Thus, Titan's purchase of the notes had no impact on STI other than changing the identity of the parties to whom it owed the money. Therefore,

---

whether those sales occurred or at what price. In fact, for transactions covered by the contingent transaction fee provision, STI was to provide not only a five percent fee, but stock warrants as well. Neither in its brief nor at oral argument did Downer explain how the warrant provision made any sense in the context of the sale of existing stock. At the beginning of trial, Downer's lead witness indicated that the company was seeking warrants based on STI's issuance of new stock *certificates* to Titan for the existing stock it had purchased. A subsequent Downer witness appeared to acknowledge the awkwardness posed by the warrant provision. He explained that Downer did not include such a contractual provision when it was hired to sell companies because the buyer would not "want Downer tagging along as a minority shareholder" and because "there's no way to realize value for the warrants." In its closing argument, Downer glossed over the warrant issue, content instead with requesting that the jury award it the five percent cash component.

[22]As noted above, the judge reduced the jury verdict by over $800,000 through duplicative routes: partially granting the motion for a judgment n.o.v. and conditionally granting a motion for a new trial unless Downer accepted a remittitur. The defendants conceded that Downer has a right to appeal the judgment n.o.v. ruling even though it accepted the remittitur, so we need not consider whether Downer would have waived its cross appeal had the judge relied on the remittitur alone. Compare *Baudanza* v. *Comcast of Massachusetts I, Inc.*, 454 Mass. 622, 626 n.4 (2009) (noting that some jurisdictions allow parties who have accepted a remittitur or additur to cross appeal, thus revoking acceptance). Given that the trial judge relied on the same ground for his partial grant of the judgment n.o.v. and his conditional grant of the motion for a new trial, the defendants' counterintuitive argument that a ruling in Downer's favor on the cross appeal means that the defendants are somehow automatically entitled to a new trial has no merit.

the judge correctly concluded that, as a matter of law, Titan's purchase of these notes could not be viewed as an "equity or debt investment in STI" (for which STI was required to pay a contingent transaction fee to Downer).

However, the same cannot be said with regard to the cash advances that Titan provided to STI. On this record, the jury could have concluded that such payments provided the very expansion capital that STI had been seeking and that it had hired Downer to help obtain.[23] The fact that Titan at this point fully owned STI Holding, which in turn owned STI, does not by itself prevent the cash infusions from being considered debt investment. Cf. *Union Pac. R. Co.* v. *Commissioner of Int. Rev.*, 69 F.2d 67, 69 (2d Cir. 1934) (for tax purposes, bonds of wholly-owned subsidiary held by parent can still be considered "held for investment"). Indeed, STI itself characterized these transactions as "loans" from Titan in an internal accounting document, and an STI witness acknowledged that the cash advanced to STI reflected money that STI "owed to Titan."

The defendants are left to argue that, where there was no loan instrument, no apparent interest, and no plain consequences if STI did not repay the loan, the cash infusions should not be considered debt investments. The defendants rely on contractual language providing that "[d]ebt investments include committed lines of credit and all other interest bearing instruments." They interpret "include" as definitional, such that the term "debt investments" means, and only means, loans set forth in interest bearing instruments. Although this is a possible reading of the contractual language, it is not the only reading. See *Connerty* v. *Metropolitan Dist. Commn.*, 398 Mass. 140, 149 n.8 (1986) ("The use of the word 'including' in [G. L. c. 258,] § 10(*c*), indicates that the enumeration of intentional torts in that section is not an all-inclusive list").[24] We believe that the word "include" as used in reference to "debt investments" allowed the jury to

---

[23]The defendants contest whether Downer can reasonably claim any credit for Titan's tender offer, as well as the benefits that flowed to STI from it. That dispute is beside the point; the contract did not require Downer to prove that its own actions led to STI obtaining financing in order to be entitled to a contingent transaction fee. See page 788 and note 5, *supra*.

[24]See also 2A Singer & Singer, Sutherland Statutory Construction § 47.23, at 417 (7th ed. 2007) ("When 'include' is utilized, it is generally improper to conclude that entities not specifically enumerated are excluded"); Webster's

conclude that, while loans established by interest bearing instruments are part of the larger class of debt investments for which a contingent fee was due, they do not delimit the boundaries of that class. The term "debt investments" is sufficiently elastic to encompass the infusions of cash that Titan provided, especially given that the raising of this capital fulfilled the very purpose for which Downer was hired.

A question remains as to how the cash advances should be measured. As noted above, Downer claims a contingent transaction fee on cash advances totaling over ten million dollars, a figure it derives by adding up all of the transactions in one direction, while ignoring all of those in the other. We agree with STI that reliance on that figure was unreasonable. While the exact financial relationship between STI and Titan is difficult to characterize, Titan effectively provided STI a line of credit against which it could draw. As STI suggests, a more appropriate measure of the value of such "financing" is the maximum balance it allowed STI to draw over the course of the year (the largest amount of debt held by Titan that could at any point have been used by STI for its operations).[25] Although it could be argued that even this figure overstates the value of the transac-

Third New International Dictionary 1143 (2002) ("include" means "to . . . list . . . as part of a whole or of a larger group, class, or aggregate").

The following excerpt from *Adams* v. *Dole*, 927 F.2d 771, 776-777 (4th Cir. 1991), well illustrates the two different common meanings of the word "including":

> "[T]he term 'including' is perhaps more often than not the introductory term for an incomplete list of examples. Thus, when we say that several colors, 'including red, blue and yellow' are in the rainbow, we are giving only examples, and we do not mean that the rainbow does not include other colors. In that sense, an 'including' clause is illustrative. However, the term 'including' can also introduce restrictive or definitional terms. If we say that 'all licensed drivers, including applicants for driver's licenses, shall take an eye exam,' the word 'including' means 'and' or 'in addition to.' That meaning is derived from the fact that a 'licensed driver,' by definition, excludes an 'applicant,' and therefore if we intend to include applicants we must say so. The inconsistency between the general word and the specific leads to an interpretation, under principles of ejusdem generis, that the general may be defined by the specific."

[25]We note that the three million dollar figure is consistent with the amount that Titan was contemplating loaning STI when it was considering participating in the Eureka proposal. Three million, of course, does fall below the ten

tions (since its average balance was lower), Downer prevailed at trial and it is entitled to the maximum portion of the jury award that can reasonably be justified in the evidence. We therefore conclude that Downer is entitled to a five percent contingent transaction fee on $3,000,063 ($150,003).[26]

Finally, we note that our result is consistent with the reasonable expectation of the parties when they entered into the contract. See 1 Corbin on Contracts § 1.1, at 2 (1993) ("That portion of the field of law that is classified and described as the law of contracts attempts the realization of reasonable expectations that have been induced by the making of a promise"). Downer was hired to help STI raise capital, and it had a reasonable expectation of obtaining a five percent fee on the capital raised during the life of the contract and the one-year tail period. Downer had no reasonable expectation that it would be entitled to five percent of the value of the eighty percent of the company not owned by Titan.[27] Conversely, when STI signed the contract, it expected that it would have to pay five percent of the financing that became available during the relevant time period; any expectation that it could escape any contingent fee even if capital was raised was not reasonable.

*Conclusion.* The judgment is reversed and the case is remanded for a new judgment to be entered providing that Downer take no contingent transaction fee on Titan's purchase of existing STI stock; Downer take a contingent fee on cash advances from Titan to STI computed on the maximum balance Titan allowed

---

million dollars that Downer was hired to help raise. STI did not argue in its briefs that this would deprive Downer of entitlement to any contingent transaction fee, and the argument is waived. In any event, the witnesses appeared to share a common understanding that Downer would have been owed contingent transaction fees had the Eureka deal gone through, even though it also fell below the ten million dollar threshold.

[26]The judge ordered that interest accrue from August 19, 2002. Neither side has challenged that accrual date.

[27]During the relevant time period, Downer used a different form of contract when it was hired to sell companies (the vast majority of Downer's business). That form included a sliding scale of compensation — known as a "Lehman scale" — that would have produced a net percentage rate that was substantially lower than five percent. Thus, even if STI had engaged Downer to sell the company, the compensation that Downer would have been due under its usual contract would be far less than what it was seeking in this case.

STI draw down, i.e., $3,000,063; interest on amounts due to accrue from August 19, 2002.

*So ordered.*