CHURCH OF THE HOLY SPIRIT OF WAYLAND vs. HEINRICH, 101 Mass. App. Ct. 32

 
 CHURCH OF THE HOLY SPIRIT OF WAYLAND & others [Note 1] vs. MARILYN J. HEINRICH & others [Note 2] (and a companion case [Note 3]).

101 Mass. App. Ct. 32
 October 6, 2021 - May 5, 2022

Court Below: Superior Court, Middlesex County
Present: Milkey, Henry, & Walsh, JJ.

 

Nos. 21-P-7 & 21-P-8.

Further appellate review granted, 490 Mass. 1105 (2022).

Cemetery. Church. Contract, Church, Construction of contract. Trust, Reformation. Jurisdiction, Ecclesiastical controversy. Constitutional Law, Freedom of religion. Religion.

In a dispute arising from the efforts of several church entities (a parish of the Episcopal Diocese of Massachusetts that sold its property -- including a churchyard in which cremated human remains had been interred -- to a Coptic church) to obtain judicial permission to disinter and relocate cremated human remains buried in the churchyard, against the wishes of the families 

 Page 33 

of the deceased, the church entities' challenge to the standing of the family members opposing disinterment (surviving spouses, children, and parents of the deceased) lacked merit, where case law long has recognized that immediate family members of those whose remains have been interred in a burial ground have standing to bring challenges to the subsequent treatment of those remains and of the burial lots where the remains have been committed. [38-39]

Discussion of the legal nature of a dispute arising from the efforts of several church entities to obtain judicial permission to disinter and relocate cremated human remains buried in a churchyard, against the wishes of the families of the deceased, involving principles of contract law, property law, trust law, and constitutional law. [39-40]

In a dispute arising from the efforts of several church entities (a parish of the Episcopal Diocese of Massachusetts that sold its property -- including a churchyard in which cremated human remains had been interred -- to a Coptic church) to obtain judicial permission to disinter and relocate cremated human remains buried in the churchyard, against the wishes of the families [33] of the deceased, this court concluded that the interred remains retained protection based on principles of contract, property, and trust law, where, in the contracts by which the parish sold individual burial lots to its interested parishioners for a stated sum, the parish did not reserve the unilateral right to decide whether the churchyard would continue to exist [40-42]; where, distinguishing an earlier case in which the Supreme Judicial Court upheld the right of a church to disinter bodies entombed underneath the existing church structure over the objections of family members of the deceased, the doctrinal issue posed in that case was the constitutionality of a legislative act that expressly sought to relieve the church from its obligations to maintain the entombed bodies in place [42-43]; where, in the absence of a governing statute, common-law trust principles applied to the disinterment of human remains from a dedicated burial ground until such time as the families of the deceased have abandoned the remains or the burial ground is no longer recognizable as such [43-45]; where the enactment of G. L. c. 272, § 71 (criminalizing the disinterment of "a human body, or the remains thereof," absent approval "by the proper authorities"), did not supplant common-law principles [45-47]; where, although sometimes altered circumstances could warrant the disinterment of remains, even in the face of expectations that such remains would forever endure, the churches here failed to demonstrate how the closing of the parish and sale of the property rendered it impossible to fulfill the families' interest in having their loved ones' remains stay where they had been laid to rest, in the location where all contracting parties had agreed they would lie in perpetuity [47-50]; and where the Coptic church did not demonstrate that a judicial order preventing it from removing the remains that had already been committed to the ground at the time when it freely took title to the property would constitute government interference with its free exercise of religion rights under Federal and State constitutional law [50-52]; finally, this court remanded the matter for resolution of the unaddressed issue of what leaving the remains interred in place would mean as a practical matter for each party and what specific relief would be appropriate [52].

Civil action commenced in the Probate and Family Court Department on August 29, 2017.

 The case was heard by Camille F. Sarrouf, Jr., J, on motions for summary judgment.

Civil action commenced in the Superior Court Department on June 28, 2019.

 A motion to dismiss was heard by Camille F. Sarrouf, Jr., J.

 William F. Gramer for Marilyn J. Heinrich & others.

 Edward Notis-McConarty (Donna A. Mizrahi also present) for Church of the Holy Spirit of Wayland & another.

 Audrey Y. Botros for Saint Philopateer Mercurius & Saint Mina Coptic Orthodox Church.

 MILKEY, J. The controversy before us comes down to this: may cremated human remains that are buried in a churchyard be disinterred and moved elsewhere against the wishes of the families 

 Page 34 

of the deceased? The trial court judge ruled that, as a matter of law, the church that established the churchyard retained the unilateral right to relocate the remains. As explained below, we conclude that the interred remains retain protection based on principles of contract, property, and trust law. Accordingly, we reverse and remand.

 Background. [Note 4] 1. Creation of the churchyard. In 1961, the Episcopal Diocese of Massachusetts (diocese) formed a new parish as a legally separate entity known as the Church of the Holy Spirit of Wayland (parish). The parish built a church on a four-acre parcel on Rice Road in Wayland. In 1967, the parish purchased an additional 1.4-acre parcel behind its church. A small portion of that additional land was designated as an area where parishioners could have their cremated remains buried. [Note 5] According to the historical documents included in the record, the area has been described variously as a "burial ground," a "memorial garden," and a "churchyard." The last term appears to be the one most frequently used, and we adopt it for uniformity, except where a different term is used in quotation.

 2. Layout and sale of burial lots. The parish designed the churchyard to have sixty-four individual four-foot by five-foot burial lots lining its periphery. [Note 6] Each burial lot was large enough to contain the cremated remains of two individuals. A fence was built around the churchyard, and a large wooden cross placed 

 Page 35 

near its center. [Note 7] 

 The parish sold individual burial lots to its interested parishioners for a stated sum. Each purchaser received a one-page "churchyard certificate of purchase" that stated in pertinent part that the recipient had obtained "[t]he right to [a particular numbered burial lot] for the interment of two (2) cremains, [Note 8] in the Churchyard of the Church of the Holy Spirit, Wayland, Massachusetts." The certificate also stated that "[t]his right is sold subject to the Churchyard regulations now or hereafter in force."

 3. Churchyard regulations. The regulations in turn set forth various time, place, and manner restrictions. For example, they limited the timing and manner of interment and visitation. As another example, although the regulations allowed grave markers to be placed in the individual burial lots, they strictly limited the number, size, composition, and placement of such markers. According to the regulations, "[a]ll lots and rights are sold with perpetual care," and "perpetual care" is specifically defined as care that "provides for simple maintenance of the Churchyard, keeping individual lots and the Memorial Grounds free of fallen branches and trees, trimming of trees when necessary, and maintaining a path through the Churchyard. It does not include care or replacement of [grave] markers." "[D]isinterment or removal of remains" was strictly prohibited "without the consent of the [parish's] Vestry." Nothing in the regulations as originally drafted expressly reserved the unilateral right of the parish to relocate the remains buried at the churchyard.

 4. Use of the churchyard. Over the decades, the cremated remains of fifty-one people were buried in the churchyard, with the last such burial having taken place in 2006. As depicted in photographs included in the record, the portion of the churchyard where the burial lots are located resembles a typical cemetery in most respects, albeit one that is more wooded than manicured. 

 Page 36 

Thus, for example, individual grave markers allow families to visit the specific sites where their loved ones have been laid to rest.

 5. Closing of the parish/sale of church property. With the dawn of the new century, membership in the parish began to wane. In March of 2015, the parish voted to terminate its operations, and the bishop, as head of the diocese, appointed an "[e]xecutive [c]ommittee" to wind down the parish's business. [Note 9] The executive committee sought formal approval to sell the parish's real estate (property) for a minimum of $1.65 million. The relevant standing committee of the diocese approved that request, but added the condition that "all efforts be made to preserve the memorial garden on the property."

 The executive committee found a Coptic church that was willing to purchase the property for a sum above the designated minimum. [Note 10] However, during its negotiations for the purchase of the property, the Coptic church expressed its opposition to retaining the churchyard for two reasons. First, the Coptic church wanted the freedom to develop the area occupied by the churchyard. Second, cremation is against the religious beliefs of the Coptic church. The parties thus agreed that the parish would remove the cremated remains buried in the churchyard, and that this condition of sale would survive the closing. Declaring that "all efforts had been made to preserve the memorial garden on the property, and that such efforts had been exhausted," the executive committee voted to approve the sale of the property to the Coptic church for $1.8 million. By quitclaim deed dated January 4, 2016, the parish transferred the property to the Coptic church. 

 6. Efforts to secure familial consent. To fulfill their contractual obligation regarding the closing of the churchyard, the Episcopal parties approached the families of those whose remains were buried there. The Episcopal parties offered to disinter the remains 

 Page 37 

and move them elsewhere at their expense. [Note 11] The families of thirty-six of those buried in the churchyard agreed, and the corresponding remains were disinterred and moved elsewhere. The families of at least fifteen people whose remains were buried there declined the Episcopal parties' offer, desiring instead that such remains stay in place. Although the primary focus of those family members was preventing the disinterment of their loved ones' remains, two family members claim that they purchased "burial rights" that would allow their own remains to be interred in the churchyard next to relatives whose remains are buried there. The Episcopal parties were not able to locate next of kin for some people whose remains were interred in the graveyard.

 7. Amendment to churchyard regulations. In June of 2016, several months after the parish sold the church property, the executive committee voted to amend the parish's churchyard regulations to address the disinterment of the remains. Specifically, the vote purportedly added the following new paragraph to the regulations:

"If the Church of the Holy Spirit ceases operations or ceases operations at the property where the Churchyard Memorial Garden is located, then the Vestry or Executive Committee, as the case may be, may cause the Churchyard Memorial Garden to be discontinued or moved to an alternate location, and/or cause all cremated remains located at the Churchyard Memorial Garden to be disinterred and relocated to one or more other locations within the Diocese of Massachusetts or returned to the families of the cremains." 

 8. Prior proceedings. In August of 2017, the parish, the diocese, and the Coptic church (collectively, the churches) filed an equity action in Probate and Family Court (Probate Court) seeking judicial permission to disinter the remaining remains. Listed as defendants were seven identified parties who actively objected to disinterment. These defendants asserted counterclaims for breach of contract, tortious interference with contractual relations, and violations of G. L. c. 93A. After those counterclaims were dismissed for lack of subject matter jurisdiction in the Probate Court, some of the families refiled those claims in a 

 Page 38 

separate Superior Court action. [Note 12] A Superior Court judge was then specially assigned as a Probate Court judge so that the two related actions could be heard together. 

 The merits of both actions eventually were addressed on cross motions for summary judgment filed in the Probate Court case and a motion to dismiss filed by the Episcopal parties in the Superior Court case. [Note 13] The judge ruled in favor of the churches, explaining his reasoning in a thoughtful memorandum of decision. Judgment entered in the Superior Court action dismissing the families' claims, and judgment entered in the Probate Court action declaring "[t]hat the Episcopal Parties have the authority to disinter the remaining cremains in the Memorial Garden so that the cremains can be relocated." Family members who lost as plaintiffs in the Superior Court action, and as defendants in the Probate Court action, timely appealed from both judgments. 

 Discussion. 1. Standing. The family members who oppose disinterment are the surviving spouses, children, and parents of those whose remains are buried in the churchyard. [Note 14] To the extent that the churches argue that such family members lack standing to contest disinterment, [Note 15] we discern no merit in such arguments. The cases long have recognized that immediate family members of those whose remains have been interred in a burial ground have standing to bring challenges to the subsequent treatment of those remains and of the burial lots where the remains have been committed. For example, in Messina v. LaRosa, 337 Mass. 438, 442 (1958), the Supreme Judicial Court upheld the right of a sister of the deceased to bring an action challenging the removal 

 Page 39 

of a cemetery monument from a grave. [Note 16] See Weld v. Walker, 130 Mass. 422, 424 (1881) (affirming judgment that allowed husband to move his wife's remains to family plot based on his claim that he was pressured into initially burying her in cemetery owned by her brothers-in-law). The standing afforded to family members in this regard is not based on any property interest but on "a recognition of principles of ethics, propriety, and common decency which equity is peculiarly qualified to enforce." [Note 17] Messina, supra at 442.

 2. The nature of the dispute. Before turning to the specific legal issues raised, we touch on the overall nature of the dispute before us. Unpacking the rights asserted by each side requires us to address several different doctrinal areas. The starting point is contract law: what were the terms of the agreement between the parish and those individual parishioners who bought burial rights in the churchyard? The families argue that the parish agreed that interred remains could stay in place indefinitely, while the churches argue that the parish reserved the right to close the churchyard and disinter the remains.

 However, reference to contract law alone does not cover all aspects of the controversy, because the families are seeking to enforce long-term restrictions on the use of real property even after that property has been sold to a third party. [Note 18] Both sides 

 Page 40 

therefore also seek to invoke property law concepts in support of their respective positions. The families point to cases that treat burial rights as a species of property, a status that allows such rights to be protected even when the burial ground has been sold. See Trefry v. Younger, 226 Mass. 5, 9 (1917) (recognizing burial rights as being "in the nature of an easement or irrevocable license" that can bind subsequent purchaser even when no easement or other restriction had been recorded on deed). For their part, the churches point to language in such cases that suggests that any property interest held in a burial ground ceases once the land is no longer used as a burial ground. See id. (right to be buried in particular location lasts only "so long as the place continues as a burying ground"). More generally, the churches argue that indefinitely burdening property is anathematic to basic tenets of property law, especially where no such restriction has been recorded. 

 Looking beyond contract and property law, the families also seek to support their position by invoking trust law. Specifically, they point to cases in other jurisdictions that recognize that one who purchases land on which human remains have been buried holds such land subject to trust principles. See, e.g., Hines v. State, 126 Tenn. 1, 4-6 (1911). The churches urge us not to follow such cases, and they argue that, in any event, changed circumstances can warrant disinterment even where trust principles apply. They further argue that any common law protections for the remains were supplanted by statute. Finally, invoking constitutional principles, the churches assert that even if a private owner of a burial ground could not unilaterally disinter the remains buried there, their status as churches allows them to do so.

 3. Amendment of the churchyard regulations. We turn next to the specific terms of the contracts between the parish and individual parishioners who purchased burial rights in the churchyard. The basic terms are plain. The parishioner obtained the right to have cremated remains interred in a designated burial lot. The certificates of purchase did not recognize that the parish thereafter unilaterally could disinter interred remains, and at the time the contracts were executed, the regulations stated that the parish would provide for "perpetual care" of the burial lots. According to the families, disinterring the remains against their wishes 

 Page 41 

would constitute an obvious breach of the contract. [Note 19] 

 The judge nevertheless ruled that the terms of the contract allowed disinterment. He reasoned that by reserving the right to amend its churchyard regulations, the parish retained the unilateral right to close the churchyard, as it purported to do when it amended those regulations in 2016. [Note 20] We disagree that, as a matter of contract law, this is a reasonable interpretation of the agreement between the parties.

 As detailed above, the churchyard regulations in effect when the certificates of purchase were issued regulated the time, place, and manner of interments, visitation, and upkeep. By subjecting the certificates to both the then-current regulations and to those "hereafter in force," the parish plainly reserved its right to modify the specific limitations in effect when the rights to interment were sold. The question we face, however, is whether the parish also was reserving the right to decide unilaterally whether to extinguish the churchyard altogether. As with contract interpretation issues generally, the touchstone of what a contract means is what the parties intended. "In addressing that question, '[t]he objective is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.'" Merrimack College v. KPMG LLP, 88 Mass. App. Ct. 803, 805 (2016), quoting Sullivan v. Southland Life Ins. Co., 67 Mass. App. Ct. 439, 442 (2006). A linguistically possible reading is to be rejected if it would amount to an unreasonable interpretation of the bargain that the parties struck. See Merrimack College, supra at 806, citing Downer & Co., LLC v. STI Holding, 

 Page 42 

Inc., 76 Mass. App. Ct. 786, 792-794 (2010).

 Reading the language of the certificates of purchase as a whole and in context, we conclude that in executing those contracts, the parish did not reserve the unilateral right to decide whether the churchyard would continue to exist. Nothing in the language or context of the contracts suggests that this was intended. To the contrary, the fact that the regulations provided for "perpetual care" at the time the contracts were executed supports the families' contention that all parties intended the churchyard to be the final resting place of those buried there. See Webster's Third New International Dictionary 1684-1685 (2002) (defining "perpetual" as "continuing forever," and "granted to be valid for all time"). Interpreting the language of the certificates in the manner the churches advocate supplies an unreasonable reading of the bargain struck by the parish and the parishioners who purchased burial lots. 

 Our conclusion is reinforced by the ease with which the parties could have addressed the issue in their contractual language. "[W]here 'it would have been a simple matter for' the contract drafter to include a term it now claims is brought within the sweep of arguably ambiguous contractual language, '[w]e see no reason to add th[at] term[] now.'" Merrimack College, 88 Mass. App. Ct. at 807, quoting Ajemian v. Yahoo!, Inc., 83 Mass. App. Ct. 565, 577 (2013). [Note 21] 

 4. Trinity Church case. In ruling that the churches had the authority to disinter the remains over the objections of the family members, the judge also relied in great part on an 1871 case involving Trinity Church in Boston. See Sohier v. Trinity Church, 109 Mass. 1 (1871) (Trinity Church). Trinity Church originally was located on Summer Street in downtown Boston. Id. at 16. The church desired to sell that parcel and "build a new edifice in some new place in the city [considered] more convenient and agreeable than the present one." Id. at 17. This raised the question of what to do with the bodies entombed underneath the existing church structure. See id. at 17, 21. The Supreme Judicial Court 

 Page 43 

upheld the right of the church to disinter the bodies over the objections of family members of the deceased. See id. at 22-23. Along the way, the court recognized that there are occasions when the wishes of family members must bend to other interests. See id. 

 In light of the similarities between the controversy in Trinity Church and the one before us, it is understandable that the judge concluded that that case provided strong support for the churches' position. However, a closer analysis reveals that the legal dispute in Trinity Church arose in a markedly different context. In that case, the Legislature had determined that the bodies entombed in the abandoned church presented a public health hazard, and it authorized their disinterment in order to eradicate that hazard. See Trinity Church, 109 Mass. at 17-18; St. 1871, c. 221. Accordingly, the doctrinal issue posed in Trinity Church was the constitutionality of a Legislative act that expressly sought to relieve the church from its obligations to maintain the entombed bodies in place, despite the court's recognition that the land had been granted to the church in trust as a tomb. See Trinity Church, supra at 17-18, 21-22. In upholding the statute, the Trinity Church court expressly reserved what result would have been warranted had the Legislature not acted, that is, how the case would have been resolved applying common law principles. See id. at 23. We turn to those principles.

 5. Common law. As the families accurately point out, there are many cases across the country that extend common law protections to remains interred in dedicated burial grounds. A frequently cited example is Hines, 126 Tenn. at 4-5. That case recognizes that once human remains have been committed to the ground, certain trust concepts apply, preventing their disinterment: 

"When land has been definitively appropriated to burial purposes, it cannot be conveyed or devised as other property, so as to interfere with the use and purposes to which it has been devoted. When once dedicated to burial purposes, and interments have been made, the then owner holds the title to some extent in trust for the benefit of those entitled to burial in it, and [a new owner] takes the property subject to this trust." 

Id. Other examples of cases that recognize these common law principles abound. See Sanford v. Vinal, 28 Mass. App. Ct. 476, 

 Page 44 

483-484 (1990) (collecting cases). Pursuant to such cases, burial grounds lose their protections under the common law when they have been abandoned or, through the passage of time, become unrecognizable. [Note 22] As one New York court eloquently put it almost two centuries ago:

"When these graves shall have worn away; when they who now weep over them shall have found kindred resting places for themselves; when nothing shall remain to distinguish this spot from the common earth around, and it shall be wholly unknown as a grave-yard; it may be that some one who can establish a 'paper title,' will have a right to its possession; for it will then have lost its identity as a burial-ground, and with that, all right founded on the dedication must necessarily become extinct."

Hunter v. Trustees of Sandy Hill, 6 Hill 407, 414-415 (1844).

 We had occasion to examine this line of cases in 1988. See Sanford, 28 Mass. App. Ct. at 483-484. In that case, eighth-generation descendants of people buried at a certain property were seeking to block the development of that land. See id. at 477. Relying on the Hines line of cases, they argued that common law trust principles prevented disinterment of their ancestors. See id. at 483-484. Although we spoke of such cases with seeming favor, we did not rule that the principles for which the cases stood are enshrined in Massachusetts common law. Instead, we left that issue unresolved, because we concluded that even if the Hines line of cases applied, the family members would lack standing to assert their claims under the particular facts presented there. See id. at 485-486. That is because -- eight generations later -- the 

 Page 45 

cemetery was no longer recognizable as such; the grave sites could not be located and only shards of headstones could be found. See id. at 487. We concluded that, under the undisputed facts, the property had been abandoned as a burial ground, and the family members lacked any standing apart from that held by members of the general public in enforcing generally applicable laws with respect to ancient burial grounds. See id. at 487-488. 

 The situation in the case before us is quite different from that in Sanford. As noted, the family members here are not distant relatives, but are the spouses, parents, and children of those whose remains are buried in the churchyard. The churches have not made, and cannot make, any claim that these family members have abandoned their interest in seeing that the remains of their immediate family members stay where they were committed to the ground. This being the case, we now face the question left unanswered in Sanford, whether to interpret Massachusetts common law as following the principles set forth in the Hines line of cases.

 In our view, the reasoning of such cases is persuasive and, indeed, finds support in Massachusetts case law. Even though Massachusetts appellate courts have not had occasion to address the precise question before us, the cases on burial rights are infused with trust-like principles that are consistent with those expressed in Hines. For example, as we have noted, the Supreme Judicial Court recognized that once land has been dedicated to public use as a burial ground, when title to such land is transferred, it remains subject under the common law to the rights of those who purchased burial rights there, even where such rights were not recorded on the deed. See Trefry, 226 Mass. at 9. If the right to be buried in the future is protected by the common law in this manner, then surely the common law also offers protection where remains already have been committed to the ground. 

 For these reasons, we now hold that in the absence of a governing statute, common law trust principles apply to the disinterment of human remains from a dedicated burial ground until the families of the deceased have abandoned the remains or the burial ground is no longer recognizable as such. Before turning to the legal ramifications of this, we must address a particular argument that the churches now make that the Legislature has displaced that common law.

 6. G. L. c. 272, § 71. In their initial briefs, the churches made no argument that the Legislature had authorized them to disinter 

 Page 46 

the remains at the churchyard (whether to serve an important public purpose or otherwise). At oral argument, we called the parties' attention to the fact that there is one general law that touches on the subject matter: G. L. c. 272, § 71. That statute makes it a felony to disinter human remains unless it has been "authorized by the proper authorities." G. L. c. 272, § 71. In supplemental briefing that we requested, the churches now argue that by enacting the statute, the Legislature has displaced common law. 

 The original version of what now appears as G. L. c. 272, § 71, was enacted in 1815. See St. 1814, c. 175. The statute criminalized the disinterment of "any human body, or the remains thereof" except where this had been authorized by the local board of health or selectmen. See id. This statute on graverobbing was enacted to address the increased demand for bodies for medical dissection. See Commonwealth v. Cooley, 10 Pick. 36, 39 (1830). Notably, the statute does not criminalize the disinterment of all bodies, which had been a common law crime; rather, the statute recognized that no crime would have been committed where the person disinterring the body had a license to do so from local officials. [Note 23] See id. 

 The current version of the statute generally makes it a crime to disinter "a human body, or the remains thereof," absent approval "by the proper authorities." G. L. c. 272, § 71. The statute no longer specifies who might be a "proper authority" who could approve disinterment for purposes of the statute. There is, however, a suggestion in the case law that, at least in some circumstances, an ecclesiastical entity would qualify. See Weld, 130 Mass. at 423 ("When a body has once been buried, no one has the right to remove it without the consent of the owner of the grave, or leave of the proper ecclesiastical, municipal or judicial authority"). [Note 24]

 Page 47 

 The churches argue that by enacting G. L. c. 272, § 71, and its predecessor statutes, the Legislature has recognized their authority to authorize disinterment and thereby effectively has supplanted any common law to the contrary. Although this argument is not without some force, we are unpersuaded. 

 For purposes of our analysis, we assume arguendo that the churches' approval of the disinterment of the remains at the churchyard would preclude criminal prosecution pursuant to G. L. c. 272, § 71, of the people who undertook that task. However, we do not view this as answering the separate question whether the churches could disinter the remains over the objections of the immediate family members of the deceased. As discussed above, the relationship between the families and the churches with respect to disinterment implicates common law trust principles that the Legislature has not directly abrogated. Contrast Trinity Church, 109 Mass. at 22 (upholding statute that specifically authorized buyer of church property to take such land free and clear of trust obligation regarding entombed bodies). Although the Legislature is free to amend the common law, "[w]e will not presume that the Legislature intended . . . a radical change in the common law without a clear expression of such intent." Commercial Wharf E. Condominium Ass'n v. Waterfront Parking Corp., 407 Mass. 123, 129 (1990). We do not read the enactment of G. L. c. 272, § 71, as supplanting the common law principles we have recognized. [Note 25]

 7. Changed circumstances. The question remains what ramifications flow from our conclusion that the interred remains enjoy protection under common law trust principles. The churches argue that even if the parish did not retain a unilateral right to disinter the remains, they have shown that disinterment is warranted by a material change in circumstances. We assume arguendo that the churches are correct that the owner of a burial 

 Page 48 

ground could argue that unforeseeable changed circumstances render it no longer possible to fulfill the purposes that trust principles served to protect. Cf. Matter of the MacMackin Nominee Realty Trust, 95 Mass. App. Ct. 144, 150-153 (2019) (MacMackin) (even where interest is protected by terms of express trust, trustee may seek approval to reform trust where unanticipated changes in circumstances prohibited fulfillment of trust's purposes). [Note 26] In addition, although the holding of Trinity Church does not govern the case before us -- there being no comparable statute in place -- the larger practical point recognized by the court has force: sometimes, altered circumstances warrant the disinterment of remains, even in the face of expectations that they will forever endure. See Trinity Church, 109 Mass. at 21-23. 

 Having recognized the possibility that the owner of a burial ground might be able to demonstrate that a change in circumstances warranted the disinterment of remains, we conclude that the churches have not met, and cannot meet, that burden here. The changed circumstances on which the churches rely are the closing of the parish and the sale of the property. The question is not whether those changed circumstances exist, but whether they prevent the fulfillment of the trust purposes at issue. To be sure, the Episcopal parties' decision to close the parish and sell church property is effectively insulated from judicial scrutiny. See generally Roman Catholic Archbishop of Boston v. Rogers, 88 Mass. App. Ct. 519, 520-521, 523-524 (2015), cert. denied, 578 U.S. 975 (2016) (decision by archdiocese pursuant to canonical law to desanctify church and dispose of church property cannot be challenged in civil court). However, this does not change the fact that the closing of the parish was a foreseeable voluntary act, not some exogenous development such as the opening of a sink 

 Page 49 

hole. [Note 27] The churches have not demonstrated how the closing of the parish and sale of the property rendered it impossible to fulfill the families' interest in having their loved ones' remains stay where they had been laid to rest, in the location where all contracting parties had agreed they would lie in perpetuity. [Note 28] In the end, the churches' argument that the closing of the parish justifies disinterment amounts to a restatement of the parish's claim that it had reserved a unilateral right to close the churchyard, a claim we have rejected for the reasons set forth above. 

 One subtle variant of the churches' argument remains. This has to do with a finer parsing of the particular potential reasons that parishioners may have purchased their burial rights. While the summary judgment record well documents that those who acquired certificates of purchase did so in order that their remains (or those of family members) could be buried in the churchyard, it does not explain what drove that decision. Many factors may well have done so, including the parishioners' desire to have their remains interred at their home church. Indeed, as the term signifies, a churchyard is to some extent defined by its relationship to a nearby church. The Episcopal parties' suggestion that the closing of the parish means that the churchyard is no longer a churchyard is not without some force. To the extent that parishioners acquired certificates of purchase in order that their remains could lie next to an active Episcopal church, that end no longer can be achieved.

 Nevertheless, we ultimately are unpersuaded that such reasoning supplies the material change of circumstances that the churches need to negate the common law protections that the interred remains enjoy. For one thing, the Episcopal parties have 

 Page 50 

not shown, and cannot show, that being interred next to an active Episcopal parish was the sole, or even paramount, reason why those who purchased the right to be interred in this particular location in fact did so. For another, even if it could be shown that this goal was what drove a particular parishioner to acquire burial rights in the churchyard, there still is a separate interest in keeping in place remains that already have been committed to the ground. While many families acceded to the diocese's request to move the remains, those that did not have unmistakably voiced their loved one's desire that the remains not be moved. As the families themselves have put it, "the very purpose of the contract formed upon the purchase of a plot [is] the right to a final resting place and the creation of hallowed ground upon which family members can visit." In light of the deference that the cases afford to immediate family members to speak for the dead, we conclude that the churches, as a matter of law, cannot meet their burden of demonstrating that changed circumstances have overcome the protections the remains enjoy under the common law.

 8. Free exercise of religion. One final substantive issue remains. As an alternative ground for affirming the judgment, the Coptic church argues that because it is opposed to cremation on religious grounds, an adverse judgment would interfere with its free exercise of religion. For the reasons that follow, we conclude that the Coptic church has not demonstrated a violation of its rights in this regard.

 The free exercise of religion is guaranteed under both Federal and State constitutional law. See First Amendment to the United States Constitution; art. 46, § 1, of the Amendments to the Massachusetts Constitution; art. 2 of the Massachusetts Declaration of Rights. Because "the scope of protection afforded the right to freely exercise one's religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution," Rasheed v. Commissioner of Correction, 446 Mass. 463, 467 (2006), citing Attorney Gen. v. Desilets, 418 Mass. 316, 321 (1994), we focus our analysis on State law.

 The Supreme Judicial Court long has recognized, "in emphatic and unmistakable terms, [that the State Constitution] guarantees to all our people absolute freedom as to religious belief and liberty unrestrained as to religious practices." Opinion of the Justices, 214 Mass. 599, 601 (1913). The question is whether State action "substantially burdens [the] free exercise of religion," and, if so, "whether the Commonwealth has shown that it has an 

 Page 51 

interest sufficiently compelling to justify that burden" (citation omitted). Magazu v. Department of Children & Families, 473 Mass. 430, 443 (2016). As an initial matter, the burden is on "the party claiming an unconstitutional burden on the free exercise of religion [to] show (1) a sincerely held religious belief, which (2) conflicts with, and is thus burdened by, the [S]tate requirement" (quotation and citation omitted). Id. at 443. Once that showing has been made, the burden shifts to the party favoring State action to demonstrate "both that (3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal" (citation omitted). Id.

 It is uncontested that the Coptic church has a sincerely held opposition to cremation on religious grounds. [Note 29] The next question, however, is whether judicial relief in favor of the families would substantially burden the Coptic church's exercise of its religious beliefs. When that church freely took title to the property, the cremated remains that the Coptic church now seeks to have removed already had been committed to the ground there. Under these circumstances, we fail to see how a judicial order preventing the Coptic church from removing those remains would constitute government interference with that church's free exercise of religion rights. [Note 30] And it bears noting that the unilateral disinterment of the remains potentially might implicate the families' own free exercise of religion rights.

 As noted, although the families' primary focus is to prevent the disinterment of existing remains, two family members also assert a separate ongoing right to be buried there. An order preventing 

 Page 52 

the Coptic church from interfering with interments that would occur after that church took title presents somewhat different free exercise of religion issues. Nevertheless, we remain unpersuaded by the Coptic church's arguments. As discussed above, individuals who bought a certificate of purchase thereby acquired a property interest in the land in the nature of an easement. The Coptic church has not demonstrated how allowing the two parties holding those rights to have their remains buried at the churchyard next to those of their family members would require any affirmative involvement by the Coptic church; it simply would prevent the Coptic church from interfering with rights that the individuals themselves hold in the property. [Note 31] Nor has the Coptic church demonstrated that such a judicial order could be seen as compelling it to endorse cremation.

 9. Remand. There is little in the record before us that addresses what leaving the remains interred in place would mean as a practical matter for each party. [Note 32] Relatedly, both sides did little in their respective briefs to address what specific relief would be appropriate going forward if the remains were to stay in place, with the exception that the families included at the end of their brief a list of detailed injunctive terms they desired without ever explaining why they were entitled to such relief. [Note 33] We recognize that our reversal of the judgment leaves many issues unresolved, such as the parties' specific rights and obligations with respect to the maintenance of the remaining burial lots and the families' access to them. This may require not only development of the facts, but also the resolution of at least one nontrivial legal issue. [Note 34] We leave such issues to the remand. [Note 35]

 Page 53 

 Conclusion. We reverse the judgments, and remand this matter for further proceedings consistent with this opinion.

 So ordered.

FOOTNOTES
[Note 1] The Episcopal Diocese of Massachusetts and Saint Philopateer Mercurius & Saint Mina Coptic Orthodox Church, Inc. 

[Note 2] John Doe Heinrich No. 1, John Doe Heinrich No. 2, Mary Wilson, John Doe Wilson, John Doe Hodgins, Christopher Woodcock, John Doe Woodcock No. 1, John Doe Woodcock No. 2, Carolyn J. Kiradjieff, John Doe Jobes No. 1, John Doe Jobes No. 2, Mary Ann Montague, John Doe Turner No. 1, John Doe Turner No. 2, Judy Mosedale, John Doe Mosedale No. 1, John Doe Mosedale No. 2, Stephanie P. Edwards, John Doe Edwards No. 1, and John Doe Edwards No. 2. 

[Note 3] Mary J. Wilson & others vs. Church of the Holy Spirit of Wayland & others. 

[Note 4] The facts set forth in the summary judgment record are essentially uncontested, except as noted. 

[Note 5] The specific size of the churchyard is not set forth in the record. Based on what is included in the record, the churchyard appears to be approximately one-tenth of an acre. 

[Note 6] The diocese itself maintains that it never approved the parish's creation of the churchyard. To support that factual proposition, it primarily points to the absence of written documentation of such an approval in its files from six decades ago. The family members who oppose disinterment argue that it is implausible that the parish created the churchyard without the diocese's knowledge and approval. In support of that argument, the families submitted an affidavit from the son of Reverend Donald W. Noseworthy, who served as vicar of the parish when the churchyard was created. The record suggests that Reverend Noseworthy, an active member of the diocese's legislative body, was someone of renown and influence within the diocese. The parties debate whether this strengthens or weakens their respective arguments about whether the diocese approved the creation of the churchyard. For present purposes, it suffices to say that the extent to which the diocese explicitly or implicitly approved the parish's creation of the churchyard is not clear on the current record. 

[Note 7] Also in the center of the churchyard was an area that was "reserved for the communal interment of cremated remains." The idea behind this communal area -- referred to as the "Memorial Grounds" -- was that those who chose not to purchase individual burial lots nevertheless could have their ashes "committed to the soil." It is not clear on the current record whether the memorial grounds ever was used for its designated purpose and, in any event, no issues related to the memorial grounds are raised in the current appeal. Instead, this appeal is limited to a dispute over certain individual burial lots. 

[Note 8] It is undisputed that "cremains" is a portmanteau that refers to cremated remains. 

[Note 9] The parties appear to agree that the executive committee replaced the vestry as the parish's governing body. Once the parish voted to terminate its operations, the process of its reclassification as what is known as a "closing mission" began. The diocese, parish, and executive committee collectively are referred to as the Episcopal parties. 

[Note 10] In fact, the parish sold its property to one Coptic church, St. Mark Coptic Orthodox Church of Boston, which eventually transferred the property to a different Coptic church, Saint Philopateer Mercurius & Saint Mina Coptic Orthodox Church, Inc. However, nothing appears to turn on this subsequent transaction and, for simplicity, we refer to both Coptic churches in the singular. 

[Note 11] Specifically, the Episcopal parties offered three options: (1) reinterment in a Wayland cemetery in an area designated as a memorial garden for those affiliated with the parish, (2) reinterment in a columbarium or memorial garden at one of three Episcopal churches, and (3) returning the remains to the families. 

[Note 12] The families also added an additional claim for breach of the implied covenant of good faith and fair dealing. 

[Note 13] The motion to dismiss was filed based on the theory that if the churches prevailed in the Probate Court action so as to establish their right to move the cremated remains, the Superior Court action necessarily failed as a matter of law. 

[Note 14] As noted, at least two family members assert that they have the right to have their own remains buried in the churchyard. Although their standing to bring such a claim is self-evident, we additionally note that the Legislature has enacted a statute that appears designed to favor the ability of people to be buried next to their deceased spouses. See G. L. c. 114, § 32 ("A person shall be entitled to a right of interment for his own body in any burial lot or tomb of which his spouse was seized at any time during marriage, which shall be exempt from the operation of the laws relating to conveyance, descent and devise, but may be released by him"). 

[Note 15] The Coptic church phrases one of its arguments in terms of "standing," but its argument appears to be more one based on the merits. 

[Note 16] In Messina, 337 Mass. at 439, the person who purchased the burial lot was married twice, both times to women named Josephine. After the first Josephine was buried, a grave monument was erected in her honor. See id. at 440. After the husband married the second Josephine and himself died, he initially was buried next to his first wife. See id. at 440. However, the second Josephine eventually moved his remains elsewhere in the cemetery and moved the monument to "Josephine" with him (with references specific to the first wife erased). See id. The first Josephine's sister brought an equity action that successfully compelled the relocation of the monument back to its original site. See id. at 439, 442. In the face of a challenge to the sister's standing, the court held that she was "entitled to undo the affront to [the first] Josephine's memory occasioned by despoiling her grave of its commemorative marker." Id. at 442. 

[Note 17] The quoted language illustrates the uncommon latitude embraced by the cases with respect to allowing family members to speak for the dead without having to demonstrate that they formally are heirs to the particular rights being enforced. 

[Note 18] Generally speaking, parties cannot, by mere executory contract, create long-term restrictions that run with the land. See Well-Built Homes, Inc. v. Shuster, 64 Mass. App. Ct. 619, 626 (2005) (discussing "requirements for a covenant to run with the land"). 

[Note 19] The general rule is that contracts survive the death of the contracting parties, and the churches have not demonstrated that any exception to that rule applies here. See Kraft Power Corp. v. Merrill, 464 Mass. 145, 150 (2013), and cases cited ("At common law, actions based on contract survived the death of a party"). 

[Note 20] The Episcopal parties seek to bolster this argument by claiming that subjecting their amendment of the churchyard regulations to judicial scrutiny would improperly embroil the courts in reviewing ecclesiastical matters. See Episcopal Diocese of Mass. v. DeVine, 59 Mass. App. Ct. 722, 727-728 (2003). We disagree. The decision by the Episcopal parties to close the parish and sell the church property is not being challenged; the question is whether these parties can shed their responsibilities with respect to the churchyard when doing so. In our view, insofar as it involves the Episcopal parties, the case before us is "a dispute [that] directly concerns a purely secular matter (such as rights to the real property) and does not implicate matters of church doctrine, discipline, or authority, [and therefore] a court may exert jurisdiction over, and resolve, the dispute by the application of neutral principles of law." Id. at 727. 

[Note 21] We note that the diocese has taken steps to avoid a future dispute. Specifically, the diocese has amended its by-laws and policies and procedures manuals to make it clear that, going forward, the establishment of new burial locations requires the express written approval of the diocese and that policies must be put in place from the start to address the potential disinterment and relocation of any remains that will be buried in such locations. 

[Note 22] This is consistent with the Supreme Judicial Court's already noted statement that burial rights with respect to a particular cemetery survive only "so long as the place continues to be used as a burying ground." Trefry, 226 Mass. at 9. See McAndrew v. Quirk, 329 Mass. 423, 425 (1952) (same), citing Trinity Church, 109 Mass. 1. Drawing from such language, the churches suggest that once they decided to close the churchyard here, it was no longer used as a burial ground, and any property interests held by those who had bought burial rights there ceased. But this begs the question whether the churches had the unilateral right to cease the use of the property as a burial ground, an issue we already have addressed. We do not read Trefry, McAndrew, or Trinity Church as addressing whether, under the common law, new owners have the unilateral right to terminate the use of property as a burial ground. In addition, it bears noting that in Trefry itself, the new owner of the cemetery lost his effort to use his new plans for the land to negate the existing burial rights in that land. Trefry, supra at 7-8. 

[Note 23] In 1831, a new version of the graverobbing statute was enacted. See St. 1830, c. 57, § 1. That statute, entitled "An Act more effectually to protect the Sepulchres of the Dead, and to legalize the Study of Anatomy in certain cases," made it even more plain that the Legislature in part wanted to further the ability of medical professionals, and medical schools in particular, to have access to bodies for purposes of dissection. See St. 1830, c. 57, § 3. Indeed, local officials were given broad authority, subject to various exceptions, to make dead bodies available for dissection that otherwise would have to be buried at public expense. See id. The Supreme Judicial Court interpreted the 1831 statute in a narrow fashion that did not include a general prohibition on the unlicensed removal of bodies for purposes other than dissection. See Commonwealth v. Slack, 19 Pick. 304, 306-307 (1837). 

[Note 24] We do not interpret Weld as establishing that a church that operates a burial ground has the unilateral right to disinter the remains there over the objection of family members. 

[Note 25] In reaching this conclusion, we are cognizant of language in Cooley that the churches highlighted in their supplemental briefs. Specifically, in holding that the enactment of St. 1814, c. 174, superseded common law, the court observed that "[t]he whole subject has been revised by the [L]egislature." Cooley, 10 Pick. at 39. Read in context, however, "[t]he whole subject" refers to the criminal law of graverobbing, not the whole subject area of burial rights and disinterment. Id. at 39. 

[Note 26] MacMackin, 95 Mass. App. Ct. at 150-153, applied a section of the Massachusetts Uniform Trust Code (MUTC), G. L. c. 203E, § 412. That section incorporated the common law "'equitable deviation' doctrine." Restatement (Third) of Trusts § 66 comment a, at 493 (2003). Under the terms of the MUTC, a Probate Court judge "may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust." G. L. c. 203E, § 412 (a). "To the extent practicable, the modification shall be made in accordance with the settlor's probable intent." Id. The judge also "may modify the administrative terms of a trust if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration." G. L. c. 203E, § 412 (b). 

[Note 27] In light of our conclusion that the closure of the parish does not prevent fulfillment of the trust purposes, we need not address whether that closure was "unanticipated" and whether this independently compelled judgment in the families' favor. 

[Note 28] It bears noting that even if the Episcopal parties had shown that a change in circumstances warranted allowing the remains to be moved, this would not have relieved the parish of its contractual obligations. Thus, the families still presumably could have sued for damages. Indeed, even in Trinity Church, the court upheld the authority of the church to move the interred bodies based on an assumption that some compensation would be paid. See Trinity Church, 109 Mass. at 23 (where "owners of the tombs and the friends of the deceased have no title to the lands, but only an interest in the structures and in their proper use, the public authorities do not violate their rights of property [by having entombed remains disinterred], if proper provision is made for compensation or substitution"). 

[Note 29] We requested supplemental briefing on the free exercise of religion issues. In its supplemental brief, the Coptic church has explained its opposition to cremation as follows: "According to Coptic belief, the body must be honored as it was created in the image of God (GEN. 1:27) and the body is holy as the temple of the Holy Spirit and one must glorify God through the body. (1 COR. 6:19-20). As such, Coptic Christians believe the body belongs to Christ and must be respected [not burned] even after death as God's creation" (footnote omitted). 

[Note 30] The Supreme Judicial Court has recognized that a restraint on a church's making changes to its property can, under some circumstances, constitute a substantial burden on religious exercise. See Society of Jesus of New England v. Boston Landmarks Comm'n, 409 Mass. 38, 41-42 (1990). However, that case involved a landmark designation that would have limited a church's ability to make changes to its altar space, not as here, a limitation on the church's ability to prevent third parties from exercising their own property interests in outdoor burial lots. 

[Note 31] The families suggest that the Coptic church is precluded from asserting a free exercise of religion claim because it knowingly purchased the property while fully aware of the problem. This is akin to a defense of "coming to the nuisance." Escobar v. Continental Baking Co., 33 Mass. App. Ct. 104, 110 (1992). In light of how we resolve the free exercise of religion issue, we need not reach this argument. 

[Note 32] To the extent that either side addressed such issues at all, their statements appear untethered to the record. 

[Note 33] For example, the families request that we order that they have specific rights to use the Coptic church's parking lot. Similarly, they seek the right to "beautify[]" the grounds even though the churchyard regulations prohibit families from planting trees, shrubs, or plants. 

[Note 34] As noted, the diocese maintains that it never approved the creation of the churchyard, an issue on which there is a material dispute of fact. See note 6, supra. Resolving that issue was unnecessary in the current appeal. However, that issue might or might not be relevant to addressing the extent of the diocese's specific obligations. 

[Note 35] We reiterate the suggestion we made at oral argument that this controversy might be uniquely suited to a mediated resolution. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.